UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| LINQUISTA WHITE, EMILY BELLAMY, and JANICE CARTER, <br><br>                  Plaintiffs, <br><br>        v. <br><br> KEVIN SHWEDO, in his official capacity as the Executive Director of the South Carolina Department of Motor Vehicles; and RALPH K. ANDERSON III, in his official capacity as the Chief Judge of the South Carolina Administrative Law Court and Director of the South Carolina Office of Motor Vehicle Hearings, <br><br>                 Defendants. | Civil Action No. <br> <u>2:19-cv-3083-RMG</u> <br><br> **CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** <br><br> (Violation of Rights Under the Fourteenth Amendment to the U.S. Constitution) |

## INTRODUCTION

1.      Today, South Carolina bars more than one hundred thousand people from driving simply because they cannot afford to pay traffic tickets.  The South Carolina Department of Motor Vehicles ("DMV") automatically and indefinitely suspends driver's licenses under South Carolina Code Section 56-25-20 when people are reported for failure to pay monetary penalties for traffic violations, including fines, fees, surcharges, court costs, and assessments (collectively "traffic fines and fees").[1]  At no point before indefinitely depriving people of their driver's licenses does the DMV conduct a hearing or inquiry into an individual's ability to pay.  In fact, neither the DMV nor the South Carolina Office of Motor Vehicle Hearings ("OMVH")—the

---

[1] S.C. Code Ann. § 56-25-20 ("Section 56-25-20"). All abbreviations used in the Complaint, such as "DMV," are defined for ease of reference in Appendix A: Glossary.

agency empowered to review driver's license suspensions—ensures that only the driver's licenses of those who are able to pay, but have willfully failed to do so, are suspended under Section 56-25-20.  In a state where one out of six people endure poverty and where nine out of ten people rely on a driver's license to pursue their livelihoods, people living with an indefinite driver's license suspension under South Carolina's wealth-based system are robbed of a crucial means of self-sufficiency and pushed deeper into poverty.

2. Plaintiff Emily Bellamy, a single mother and the primary caregiver of four young children, works in a job that does not pay enough to meet her family's needs.  Plaintiff Janice Carter, an Air Force veteran, has struggled for more than a year to find consistent work and only recently secured a part-time job, which does not pay enough to support her and pay her debts. Because Ms. Bellamy and Ms. Carter could not pay fines and fees for traffic violations, the DMV indefinitely suspended their driver's licenses under Section 56-25-20 without ever holding a hearing, inquiring into their ability to pay, or determining that they willfully failed to pay. South Carolina continues to keep the driver's licenses of Ms. Bellamy and Ms. Carter suspended simply because they cannot afford to pay traffic tickets and additional fees charged by the DMV for driver's license reinstatement.  The suspensions of the driver's licenses of Ms. Bellamy and Ms. Carter are thus directly the result of their inability to pay.

3. Plaintiff Linquista White, a single mother and the primary caregiver for her nine-year-old daughter, struggles to support her family while making loan payments and contending with housing instability and the aftermath of bankruptcy.  In 2019, the DMV suspended Ms. White's driver's license for failure to pay a traffic ticket, without first holding a hearing, inquiring into her ability to pay, and determining that she willfully failed to pay.  After months of being barred from legally driving and under great financial hardship, Ms. White diverted money

needed to replace property damaged in a wrongful eviction to pay the traffic ticket and DMV reinstatement fees in order to regain her driver's license.  But Ms. White currently faces additional traffic tickets that stem from her limited financial resources, which will likely lead to the imposition of hundreds, if not thousands, of dollars in traffic fines and fees and DMV reinstatement fees that she cannot afford.  Ms. White faces a substantial and imminent risk that the DMV will again automatically and indefinitely suspend her driver's license for failure to pay traffic tickets under Section 56-25-20 without providing her a hearing, inquiring into her ability to pay, or determining that she had the resources, but willfully failed to pay.

4.     The indefinite suspensions of the driver's licenses of Ms. Bellamy and Ms. Carter are exclusively the result of their lack of financial resources.  Without driver's licenses in a state with a dearth of reliable and accessible public transportation, Plaintiffs continue to live in financial hardship, unable to secure better paying jobs and facing impossible choices to pursue their livelihoods, care for themselves and their families, and meaningfully participate in civic life.  Ms. Bellamy could pursue higher-paid work in hotel housekeeping or as a home health aide, but both jobs require a valid driver's license to travel to different work sites.  Ms. Carter has been offered a higher-paid position as a reentry caseworker, but the offer is contingent on obtaining a valid driver's license.  Because Ms. Bellamy and Ms. Carter cannot afford to pay traffic fines and reinstatement fees, their driver's licenses remain suspended, preventing them from securing these jobs and earning needed money.  Ms. Bellamy confronts barriers to taking her children to and from health care services and extracurricular activities, traveling to be with her ill mother, participating in a support group that promotes strong families, and engaging in community service activities.  Ms. Carter also faces obstacles getting to and from church without a valid driver's license, impeding her ability to worship with her religious community.

5.     Similarly, the suspension of Ms. White's driver's license for failure to pay traffic tickets was exclusively the result of her lack of financial resources.  While living with a suspended driver's license in an area with limited public transportation, Ms. White faced the impossible choice between not driving to work and risking her family's well-being or driving and risking further criminalization for not having a valid driver's license.  Indeed, Ms. White was ticketed for driving on a suspended driver's license while her driver's license was indefinitely suspended for failure to pay a traffic ticket that she could not afford.  Because of her financial limitations, Ms. White faces a substantial risk that she will again confront the difficult choice of either not driving to work to care for her and her family's needs, or driving on a suspended license and risking additional tickets.

6.     The hardships experienced by Ms. Bellamy, Ms. Carter, and Ms. White are far from unique.  As of May 2019, more than 190,000 people had South Carolina driver's licenses that were indefinitely suspended for nonpayment of traffic fines and fees.  Every month, South Carolina automatically subjects thousands of people to indefinite license suspensions solely for failure to pay traffic tickets without determining whether they could afford to pay but willfully failed to do so.  Like Plaintiffs, tens of thousands of South Carolinians are subjected to wealth-based driver's license suspensions that prevent them from finding and keeping their jobs, taking their children to and from school, seeking and receiving medical care, purchasing groceries and basic necessities, traveling to places of worship, and being with their families and communities.

7.     South Carolina's high volume of indefinite license suspensions for failure to pay traffic fines and fees is directly related to the state's high poverty rate.  According to 2017 U.S.

Census estimates, one in six South Carolinians—more than 790,000 people—live in poverty.[2] For those who can afford to pay, traffic fines and fees are an inconvenience, but can be satisfied. For those who cannot afford to pay, traffic fines and fees result in the absolute loss of a driver's license, which causes more severe economic and personal consequences. This is especially true in a state like South Carolina, where most counties are rural and lack accessible public transportation.

8.      Whenever it receives a report from a court that a defendant has not paid a traffic fine or fee, the DMV indefinitely suspends the defendant's driver's license for failure to pay traffic tickets ("FTPTT") pursuant to the agency's authority under Section 56-25-20 of the South Carolina Code. The DMV does not hold a hearing or otherwise inquire into whether the person is unable to pay or has the ability to pay but is willfully refusing to do so.

9.      To the extent a person receives any notice from the DMV of a pending license suspension for failure to pay, the written notice makes clear that the only way to prevent the suspension is to pay the owed traffic fines and fees in full before the date on which the suspension goes into effect, which is usually around three weeks from the date of the notice. The notice also makes clear that once a driver's license is suspended for FTPTT, the only way to secure reinstatement is to pay all traffic fines and fees in full and to pay the DMV a $100 reinstatement fee for each FTPTT suspension on the license. The notice fails to explain or even reference any alternative to full payment that would prevent an FTPTT suspension from going into effect or secure reinstatement of a license suspended for failure to pay traffic tickets.

---

[2] U.S. Census Bureau, *American Community Survey (2017 5-Year Estimates)*, Table S1701 (Poverty Status in the Past 12 Months)–South Carolina (2017), https://bit.ly/2VKKSJx (reporting 16.6% of South Carolina's population lives below the federal poverty level).

10.    In fact, neither the DMV nor any South Carolina agency provides any process by which a person can contest a failure-to-pay suspension under Section 56-25-20 on the basis of inability to pay—whether before or after the suspension goes into effect.  The DMV's suspension notice fails to identify <u>any</u> appeal process for people facing a pending or in-effect suspension for failure to pay a traffic ticket.  Even if a person manages to discover on their own that a DMV suspension can theoretically be appealed, the Office of Motor Vehicle Hearings refuses to provide a hearing unless the requester pays the $200 filing fee set forth in South Carolina Code Section 56-5-2952 for each contested suspension.[3]

11.    Plaintiffs Carter and White submitted written requests to the OMVH for hearings to contest the DMV's indefinite suspension of their driver's licenses for FTPTT under Section 56-25-20, sought waivers of the OMVH filing fee, and included documentation of their inability to pay.  The OMVH denied the requests simply because Ms. Carter and Ms. White did not pay the OMVH filing fees.  Thus, even people who are able to navigate an opaque, costly appeal process to identify the OMVH as a possible source of redress—despite the DMV's failure to provide any notice of this process—are denied hearings because they cannot pay filing fees.

12.    The OMVH simply does not believe that inability to pay is even a basis for preventing the suspension of a driver's license for failure to pay a traffic ticket under Section 56-25-20 or for lifting the suspension without any fee after it has gone into effect.  The OMVH never adjudicates hearings concerning challenges to FTPTT suspensions on the basis of an individual's inability to pay.  The OMVH's workload reports for Fiscal Year 2016-17 and Fiscal

---

[3] *See* S.C. Code Ann. § 56-5-2952 ("Section 56-5-2952").

Year 2017-18 do not indicate that the entity has held a single hearing concerning an FTPTT suspension, although nine cases are coded as "Miscellaneous."[4]

13.     Additionally, South Carolina Code Section 56-1-390 prohibits the reinstatement of a suspended driver's license unless the driver pays a $100 reinstatement fee for each suspension on the driver's record.[5]  Section 56-1-390 does not permit waiver of reinstatement fees for inability to pay or require any hearing or other process to assess the willfulness of nonpayment before continued, indefinite suspension of a driver's license for nonpayment of reinstatement fees.  Like Ms. Bellamy and Ms. Carter, many low-income people incur traffic tickets that lead to multiple suspensions of their driver's licenses.  As a result, they face mounting burdens to pay reinstatement fees they cannot afford.  Section 56-1-390 thus punishes people who cannot afford to pay reinstatement fees with lasting and absolute driver's license suspension.

14.     South Carolina's widespread policy and practice of suspending the driver's licenses of people who cannot afford to pay traffic tickets without first holding hearings and determining the willfulness of nonpayment has violated, and continues to violate, rights protected by the U.S. Constitution.  The Fourteenth Amendment's guarantee of due process and equal protection of the law prohibits punishing people for nonpayment without determining that they had the ability to pay, but willfully refused to do so.  *Bearden v. Georgia*, 461 U.S. 660 (1983).  Due process also requires that before the government deprives a person of their property interest in a driver's license for failure to pay through a suspension, the government must provide

---

[4] *See* South Carolina Administrative Law Court, Fiscal Year 2017-18 Accountability Report, A-9 (2018), https://bit.ly/2nRG3kD ("ALC 2017–18 Accountability Report").
[5] S.C. Code Ann. § 56-1-390(1) ("Section 56-1-390").

a meaningful process for contesting the suspension and meaningful advance notice of this process so that the individual can realistically pursue redress.

15.    Ms. Bellamy and Ms. Carter are indigent South Carolinians who, like tens of thousands of others, have suffered and continue to suffer irreparable, ongoing harm in violation of their rights to due process and equal protection because the DMV continues to indefinitely suspend their driver's licenses pursuant to Section 56-25-20, despite their inability to pay. Additionally, Ms. White will soon face irreparable, ongoing harm in violation of her rights to due process and equal protection.  Ms. White faces a substantial risk that the DMV will once again impose indefinite FTPTT suspensions on her driver's license under Section 56-25-20 because she is unable to pay fines and fees that will imminently be assessed for recent traffic tickets that stem from her limited financial resources.

16.    Plaintiffs bring this action under 42 U.S.C. § 1983 to vindicate their Fourteenth Amendment rights and to seek declaratory and injunctive relief against Defendants on behalf of themselves and classes of similarly situated people.  Plaintiffs seek: (1) a declaration that the DMV's indefinite suspension of driver's licenses for failure to pay traffic tickets under Section 56-25-20 is unconstitutional; (2) an injunction prohibiting the DMV from suspending driver's licenses for failure to pay traffic tickets under Section 56-25-20 without providing adequate pre-deprivation notice, a pre-deprivation hearing on ability to pay, and determining that the individual has the ability to pay, but willfully refuses to do so; (3) an injunction requiring the DMV to lift any driver's license suspensions previously imposed for failure to pay traffic tickets under Section 56-25-20, to strike any reinstatement fees related to those FTPTT suspensions, and to reinstate any driver's licenses that have no other basis for suspension; (4) a declaration that Section 56-1-390 is unconstitutional because it requires the indefinite suspension of driver's

8

licenses for nonpayment of reinstatement fees without requiring a hearing or other inquiry into an individual's ability to pay and a determination that nonpayment was willful; (5) an injunction that strikes Section 56-1-390 as unconstitutional, prohibits the DMV from indefinitely suspending driver's licenses solely for nonpayment of reinstatement fees, and orders the DMV to reinstate any driver's licenses that have no other basis for suspension; (6) a declaration that the OMVH's enforcement of Section 56-5-2952 to deny hearings to people seeking to contest driver's license suspensions absent payment of a non-waivable $200 filing fee for each disputed suspension is unconstitutional; and (7) an injunction prohibiting the OMVH from denying a hearing on the DMV's suspension of a driver's license for failure to pay due to nonpayment of a filing fee, absent a finding of willful failure to pay the fee.

## PARTIES

17.    Plaintiff Emily Bellamy is a Black woman and single mother who resides with her four children in Conway, South Carolina. Ms. Bellamy's driver's license is indefinitely suspended because she cannot afford to pay at least $716.50 in traffic fines and fees and at least $1,305 in reinstatement fees to the DMV.

18.    Plaintiff Janice Carter is an Air Force veteran and a Black woman. She resides in North Charleston, South Carolina. Ms. Carter's driver's license is indefinitely suspended because she cannot afford to pay $1,137.50 in traffic fines and fees and $500 in reinstatement fees to the DMV.

19.    Plaintiff Linquista White is a Black woman and single mother who resides with her daughter in North Charleston, South Carolina. Until recently, Ms. White's driver's license was indefinitely suspended because she could not afford to pay at least $647 in traffic fines and fees and $500 in reinstatement fees and penalties to the DMV. Although she was recently able to

pay to secure reinstatement of her driver's license by diverting money needed to replace damaged belongings, Ms. White now faces a substantial risk of imminent suspension of her driver's license.  Ms. White is unable to pay fines and fees likely to be assessed for three recent traffic tickets that stem from her limited financial resources.

20.     Defendant Kevin Shwedo is the Executive Director of the South Carolina Department of Motor Vehicles. In this role, Defendant Shwedo is the final decisionmaker as to the DMV's policies and practices to enforce Section 56-25-20 and the agency's suspension of driver's licenses for failure to pay traffic fines and fees pursuant to Section 56-25-20.[6]  He is sued in his official capacity as a state actor for declaratory and injunctive relief only.

21.     Defendant Ralph K. Anderson III is the Chief Judge of the South Carolina Administrative Law Court.  In this role, Defendant Anderson serves as the Director of the South Carolina Office of Motor Vehicle Hearings and promulgates rules governing OMVH procedure and practice, including the requirements for initiating an administrative action to challenge the DMV's suspension of a driver's license.[7]  Defendant Anderson is the final decisionmaker on the assignment of cases to OMVH hearing officers.[8]  He is sued in his official capacity as a state actor for declaratory and injunctive relief, and only for conduct undertaken as an administrative policymaker.

### JURISDICTION AND VENUE

22.     This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.  The Court has jurisdiction over this action

---

[6] *See* S.C. Code Ann. § 56-25-20.
[7] S.C. Code Ann. § 1-23-660(A) ("Section 1-23-660").
[8] *Id.*

pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (redress for violation of constitutional rights under color of state law).

23.    An actual, ongoing controversy exists within this Court's jurisdiction. The Court is therefore authorized to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

24.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.  This case is properly filed in the Charleston Division pursuant to Local Civil Rule 3.01 because a substantial part of the events or omissions alleged herein occurred in Charleston Division counties and because Defendants Shwedo and Anderson do business relating to the events and omissions alleged in this action in the Charleston Division counties.

## FACTUAL ALLEGATIONS

**A. A driver's license is necessary for economic self-sufficiency, to care for one's self and family, and to meaningfully participate in society.**

25.    As of May 31, 2019, more than 190,000 people had a South Carolina driver's license under indefinite suspension for failure to pay traffic fines and fees pursuant to Section 56-25-20.

26.    Impoverished and low-income people are likely to be unable to pay monetary penalties imposed for traffic violations.  Research by the Federal Reserve shows that forty percent of Americans cannot afford to pay a $400 emergency expense or could only cover such an expense by selling something or borrowing money.[9]

---

[9] Board of Governors of the Federal Reserve System, *Report on the Economic Well-Being of U.S. Households in 2017*, 2 (May 2018), https://bit.ly/2LoT78j.

27.     South Carolina suffers from one of the highest poverty rates in the nation. According to 2017 U.S. Census estimates, South Carolina has the eleventh highest population of people living in poverty in the United States, with 16.6% of South Carolinians earning less than the Federal Poverty Guideline for their household.[10]

28.     Even South Carolinians with incomes above the federal poverty level may experience significant day-to-day financial hardship.  For example, people are generally eligible for free legal assistance from South Carolina Legal Services, a federally-funded "legal aid" organization, if their household income is at or below 125% of the relevant Federal Poverty Guideline and may be eligible if their income is at or below 200% of the relevant Federal Poverty Guideline.[11]  Similarly, food assistance is provided to people whose household income is at or below 130% of the relevant Federal Poverty Guideline.[12]

29.     Black and Latinx South Carolinians experience poverty and unemployment at higher rates than white South Carolinians.  According to 2017 U.S. Census estimates, 11.2% of non-Latinx white people in South Carolina live below the poverty line, compared to 26.7% of Black people and 28.6% of Latinx people in South Carolina.[13]  U.S. Census estimates also show

---

[10] U.S. Census Bureau, *American Community Survey (2017 5-Year Estimates)*, Table GCT1701 (Percent of People Below Poverty Level in the Past 12 Months (For Whom Poverty Status is Determined)) (2017), https://bit.ly/2mnrDYW.

[11] *Income Guidelines*, South Carolina Legal Services, https://bit.ly/2lHqaMR (last visited October 28, 2019).

[12] *SNAP*, South Carolina Department of Social Services, https://bit.ly/2ikC20q (last visited October 28, 2019).

[13] U.S. Census Bureau, *American Community Survey (2017 5-Year estimates)*, Table S1703 (Selected Characteristics of People at Specified Levels of Poverty in the Past 12 months)–South Carolina (2017), https://bit.ly/2MgLEKS.

that Black South Carolinians suffer from unemployment at a rate more than double that of white residents.[14]

30.     South Carolina's indefinite suspension of driver's licenses for nonpayment of traffic fines and fees under Section 56-25-20 disproportionately harms Black people.  Analysis of DMV data, which is described below, reveals that Black people are around 3.4 times more likely than non-Latinx white people to have their South Carolina driver's license indefinitely suspended for failure to pay traffic tickets pursuant to Section 56-25-20.

31.     According to 2017 U.S. Census estimates, non-Latinx Black people make up 27% and non-Latinx white people make up 64% of the South Carolina population.[15]  But DMV data shows that, as of May 31, 2019, Black people made up 48% and white people made up only 35% of all people with driver's licenses indefinitely suspended for failure to pay traffic tickets under Section 56-25-20.  These racial disparities are linked to the longstanding racial gaps in poverty and unemployment discussed above.

32.     The suspension of a driver's license for nonpayment of traffic fines and fees has devastating consequences on the ability of people to pursue a livelihood, to meet basic needs for themselves and their families, and to meaningfully participate in civic life.  Eighty-six percent of Americans describe a car as a "necessity of life."[16]

33.     Reliable, accessible public transportation is scarce throughout the vast majority of South Carolina.  This leaves South Carolinians heavily dependent on driver's licenses to find and

---

[14] U.S. Census Bureau, *American Community Survey (2017 5-Year estimates)*, Table S2301 (Employment Status)–South Carolina (2017), https://bit.ly/2OZVIdl.

[15] U.S. Census Bureau, *American Community Survey (2017 5-Year estimates)*, Table DP05 (ACS Demographic and Housing Estimates)–South Carolina (2017), https://bit.ly/2VH3gTu.

[16] Paul Taylor and Wendy Wang et al., *The Fading Glory of the Television and Telephone*, Pew Research Center 1 (August 19, 2010), https://www.pewresearch.org/wp-content/uploads/sites/3/2011/01/Final-TV-and-Telephone.pdf.

keep their jobs, take their children to and from school, seek and receive medical care, purchase groceries and basic necessities, go to places of worship, and be with their families and communities.

34.     In a 2013 survey of 2,459 South Carolina residents concerning transportation options, 92% of respondents reported using a personal vehicle for travel.[17]

35.     The South Carolina Department of Transportation ("SC DOT") estimated in a 2014 report that only 44% of statewide public transit demands were met in fiscal year 2011.[18]

36.     In the same 2014 report, the SC DOT recognized that an increase in low-income households presented a need for public transit.  The report concluded that South Carolina lacked sufficient public transportation options to serve second- and third-shift workers, lacked "coordinated/scheduled services and coverage" in rural areas, and had "[l]imited scheduled public transit routes outside urban areas."[19]  In parts of South Carolina, major employers have openly acknowledged that the lack of public transportation hinders the ability of employees to get to work.[20]

37.     For most South Carolinians, driving is necessary to find and maintain paid employment due to the absence of reliable public transportation and lengthy commuting distances.  The median commute distance in South Carolina is 7.6 miles each way—the thirteenth longest of any state in the country.[21]  According to 2017 U.S. Census estimates, 92%

---

[17] *See* CDM Smith, *Charting a Course to 2040: South Carolina Statewide Public Transportation and Coordination Plan*, S.C. Dep't of Transp. 51 (2014), https://bit.ly/2nhxK1j ("CDM Smith").
[18] *Id.* at 66.
[19] *Id.* at 37 (Table 3-1).
[20] Eric Conner, *"I can't stay downtown": Greenville employers say poor transportation threatens jobs*, Greenville News (Apr. 8, 2018), https://bit.ly/2RqaBE8.
[21] *See* Streetlight Data, *Commutes Across America: Where Are The Longest Trips To Work?* 9 (2018), https://bit.ly/2nXpiEL.

of people in South Carolina use a car to commute to work by driving or carpool[22]—a figure higher than the national average of 85.6%.[23]  And only 0.6% of all trips to work in South Carolina were made by public transportation—less than one-eighth of the national average of 5.1%.[24]

      38.    The indefinite suspension of a driver's license severely restricts a person's ability to find and keep paid employment even when the person has access to alternative means of transportation.[25]  Being able to drive legally is a qualification for many jobs including jobs in delivery services, commercial trucking, and construction, which require travel between locations or the operation of vehicles on the job.[26]  Additionally, many employers consider a valid driver's license an indicator of reliability and employability.[27]  For example, South Carolina job postings

---

[22] U.S. Census Bureau, *American Community Survey (2017 5-Year estimates)*, Table S0801 (Commuting Characteristics by Sex)–South Carolina and United States (2017), https://bit.ly/31N6LJu.

[23] *Id.*

[24] *Id*.

[25] *See* Margy Waller, Jennifer Doleac, & Ilsa Flanagan, *Driver's License Suspension Policies,* Brookings Institution & The Annie E. Casey Foundation 2 (June 2005), https://bit.ly/2lHPemV (noting that survey respondents in 10 major U.S. cities reported that 72% of employed people have a valid car and driver's license, while only 37% of unemployed respondents had both); Danielle Conley and Ariel Levinson-Waldman, *Discriminatory Driver's License Suspension Schemes*, American Constitution Society 4–5 (2019), https://bit.ly/2lGJeuE (discussing data from various jurisdictions across the U.S.).

[26] *Id.*; *see also* Alana Semuels, *No Driver's License, No Job*, The Atlantic (Jun. 15, 2016), https://bit.ly/2lLXz9i (recognizing that driver's licenses are at times "required because employees may need to move cars—a listing for an auto detailer requires a license, for example—or move trucks, at construction sites"); Mario Salas & Angela Ciolfi, *Driven By Dollars: A State-by-State Analysis of Driver's License Suspension Laws for Failure to Pay Court Debt*, Legal Aid Justice Center 4 (2017), https://bit.ly/2xINOfd ("Driven by Dollars"); Beth A. Colgan, *Addressing Modern Debtors' Prisons with Graduated Economic Sanctions that Depend on Ability to Pay*, The Hamilton Project Policy Proposal 2019–04, 9 (2019), https://brook.gs/2GZ5nw9.

[27] Andrea M. Marsh, *Rethinking Driver's License Suspensions for Nonpayment of Fines and Fees*, *in* 2017 Trends in State Courts, Fines, Fees, and Bail Practices: Challenges and Opportunities 22, https://bit.ly/2OQrzgq (hereinafter "NCSC Report"); Back on the Road

on the Craigslist website show that a driver's license is required for many positions, including jobs in housekeeping, cleaning, construction, maintenance, painting, and warehouse staffing. Numerous South Carolina high schools offer driver's education courses, which also demonstrates public recognition of the importance of a driver's license to a successful adult life and career.[28]

39.    Research from across the country also underscores the critical link between a person's ability to maintain a valid driver's license and employment and financial stability.  The American Association of Motor Vehicles Administrators ("AAMVA") has recognized that "[p]eople who are able to legally drive are more likely to have stable employment."[29]  In response to a Rutgers University survey of suspended New Jersey driver's license holders, 42% of respondents reported losing jobs after their driver's licenses were suspended.[30]  Forty-five percent of the respondents who lost their jobs following driver's license suspensions reported that they were unable to find new jobs.[31]  Of those who were able to find employment, 88% reported a decrease in income.[32]

40.    In addition to severely restricting employment, the suspension of driver's licenses acutely limits people's ability to care for themselves and their families and to participate meaningfully in society more broadly.  People without valid driver's licenses are routinely

California, *Stopped, Fined, Arrested: Racial Bias in Policing and Traffic Courts in California* 27 (2016), https://bit.ly/1N55zsy.

[28] *See, e.g.*, *Driver Education*, Clover High School, https://bit.ly/2nPfXyz (last visited October 28, 2019); Beaufort County School District, *High School Course Catalog 2017–18*, 51, https://bit.ly/2nXO33F.

[29] American Association of Motor Vehicle Administrators, *Reducing Suspended Drivers and Alternative Reinstatement Best Practices* 7 (Nov. 2018), https://bit.ly/2nXb3zL ("AAMVA 2018 Report") (citing Margy Waller, *High Cost or High Opportunity Cost? Transportation and Family Economic Success*, The Brookings Institution Policy Brief, Center on Children and Families, no. 35, December 2005).

[30] Alan M. Voorhees Transportation Center, et al., *Motor Vehicles Affordability and Fairness Task Force: Final Report* xii (Feb. 2006), https://bit.ly/2lLarfV.

[31] *Id.*

[32] *Id.*

unable to drive to school; to take their children to school and child care; to attend doctors' appointments; to pick up prescriptions at pharmacies; to make trips to the grocery store and to public benefits offices; to travel to places of worship; and to be with their families.[33]  Driver's license suspensions can also hurt the ability of people to secure housing because housing applications often require a copy of the applicant's valid driver's license.[34]

41.    The AAMVA has recognized that "[s]uspending a person's driving privilege makes it less likely that fines will be paid if the person is unable to get to work and to pursue other daily activities such as attending school, going to medical appointments, and so on.  This is compounded for individuals who live in areas where other transportation options are not readily available."[35]

42.    Under South Carolina Code Sections 56-25-20 and 56-1-390, once a driver's license is suspended for failure to pay a traffic ticket, the DMV cannot reinstate the license until the person has paid both the underlying traffic fines and fees and a $100 reinstatement fee in full.[36]  If a traffic stop results in multiple tickets and sentences to pay fines and fees, a person who is unable to pay will face a separate, indefinite FTPTT license suspension and a $100 reinstatement fee charged by the DMV for each traffic violation.  Thus, when a person is unable

---

[33] *Id*.

[34] *See, e.g.,* Palmetto State Properties and Associates, *Rental Application Form* 1, https://palmettost.com/wp-content/uploads/2017/08/rental-application.pdf; *see also* NCSC Report, *supra* note 27, at 22; Joshua Aiken, *Reinstating Common Sense: How driver's license suspensions for drug offenses unrelated to driving are falling out of favor*, Prison Policy Initiative (Dec. 12, 2016), https://bit.ly/2gEGecW (noting that many individuals erroneously believe they must consent to landlords accessing their driving records).

[35] AAMVA 2018 Report, *supra* note 29, at 12.

[36] *See* S.C. Code Ann. § 56-25-20 ("[T]he license must remain suspended until satisfactory evidence has been furnished to the [DMV] of compliance with the terms of the citation . . . and until a reinstatement fee as provided in Section 56-1-390 is paid to the [DMV].").

to pay multiple tickets, the combined traffic fines and reinstatement fees can accumulate into hundreds—if not thousands—of dollars in debt.

43.    The indefinite suspension of driver's licenses for nonpayment of traffic fines and fees confronts indigent people with an impossible decision: lose their jobs, face barriers to finding employment, and fail to care for themselves and their families, or drive illegally and risk further legal consequences for driving on a suspended license ("DUS"), including fines, fees, jail time, and extension of probation or parole.

44.    Faced with such difficult choices, most people whose licenses are suspended continue to drive.  A 2003 report by the National Cooperative Highway Research Program estimated that as many as 75% of people with suspended and revoked licenses continue to drive while under suspension.[37]  Similarly, a study commissioned by the AAMVA Suspended and Revoked Working Group, which analyzed 114,626 driver records from eight geographically and demographically diverse states, concluded that people with suspended licenses continue to drive despite the seriousness of the consequences for driving on a suspended license.[38]

45.    In South Carolina, the steep penalties associated with driving on a suspended license push people who live with such suspensions deeper into cycles of poverty, debt, and entanglement with the criminal legal system.

46.    A first offense for driving under suspension ("DUS-1") carries a $300 fine, up to 30 days in jail, or both.[39]  A second offense ("DUS-2") carries a $600 fine, up to 60 days in jail,

---

[37] Timothy R. Neuman et al., *Guidance for Implementation of the AASHTO Strategic Highway Safety Plan Volume 2: A Guide for Addressing Collisions Involving Unlicensed Drivers and Drivers with Suspended or Revoked Licenses*, National Cooperative Highway Research Program, I–2 (2003), https://bit.ly/2nXc2jb.

[38] AAMVA 2018 Report, *supra* note 29, at 5–6.

[39] S.C. Code Ann. § 56-1-460(A)(1)(a).

or both.[40] A third offense ("DUS-3") carries a $1,000 fine <u>and</u> up to 90 days in either jail or home detention, where the defendant must pay the cost of home detention.[41]  The total monetary penalties for each of the DUS offenses is typically about double the fine amount due to the addition of fees and costs.  Thus, the total amount of fines and fees typically imposed is around $650 for DUS-1, $1250 for DUS-2, and $2100 for DUS-3.  Additionally, when an individual whose license has been suspended is convicted of DUS in South Carolina, the DUS conviction also results in an additional 30-day suspension of the person's driver's license.[42]

47.    Under South Carolina law, a person who is convicted of DUS three or more times in three years is designated a "habitual offender."[43]  And a person who is convicted of driving on a suspended license while designated a habitual offender may be charged with a felony and face up to five years of incarceration.[44]

48.    For these reasons, the indefinite suspension of driver's licenses of people who cannot afford to pay traffic fines and fees may lead to an unrelenting cycle of traffic fines and fees, unemployment, poverty, debt, and continued entanglement in the criminal legal system, with devastating consequences for individuals and their families.

---

[40] S.C. Code Ann. § 56-1-460(A)(1)(b).
[41] S.C. Code Ann. § 56-1-460(A)(1)(c).
[42] S.C. Code Ann. § 56-1-460(B).
[43] S.C. Code Ann. § 56-1-1020.
[44] S.C. Code Ann. § 56-1-1100.

**B. The DMV's enforcement of Section 56-25-20 leads to the automatic suspension of driver's licenses of indigent people for failure to pay traffic tickets without any pre-deprivation hearing, determination of willful failure to pay, or adequate advance notice of how to prevent the suspension.**

**i. South Carolina Code Section 56-25-20**

49.    The DMV indefinitely suspends driver's licenses for failure to pay traffic tickets in an exercise of its discretion under South Carolina Code Section 56-25-20.[45]

50.    Section 56-25-20 vests the DMV with the sole authority and discretion to suspend the driver's licenses of South Carolina residents and driver's license holders for noncompliance with traffic citations and littering summonses.

51.    Section 56-25-20 codifies South Carolina's participation in the Nonresident Traffic Violator Compact ("NRVC"), an interstate agreement that seeks to facilitate holding non-resident drivers accountable for certain traffic violations.[46] But on its face, Section 56-25-20

---

[45] The statute reads in relevant part:

> When a South Carolina court or the driver licensing authority of a compact jurisdiction notifies the Department of Motor Vehicles that a resident of South Carolina or person possessing a valid South Carolina driver's license has failed to comply with the terms of a traffic citation or an official Department of Natural Resources summons for a littering violation issued in this or any compact jurisdiction, the department may suspend or refuse to renew the person's driver's license if the notice from a South Carolina court or the driver licensing authority of a compact jurisdiction is received no more than twelve months from the date on which the traffic citation or an official Department of Natural Resources summons for a littering violation was issued or adjudicated. The license must remain suspended until satisfactory evidence has been furnished to the department of compliance with the terms of the citation or an official Department of Natural Resources summons for a littering violation and any further order of the court having jurisdiction in the matter and until a reinstatement fee as provided in Section 56-1-390 is paid to the department.

S.C. Code Ann. § 56-25-20.

[46] South Carolina Summary Court Judges Bench Book § M.1, https://bit.ly/2IS6CxL ("Bench Book").

applies to all South Carolina residents as well as South Carolina driver's license holders, regardless of where they reside.

52.     Section 56-25-20 does not require the DMV to suspend driver's licenses.  Rather, the statute permits the agency to indefinitely suspend a driver's license if it is notified, within twelve months of the issuance of a traffic citation or littering summons, that a South Carolina resident or driver's license holder has failed to comply with the citation or summons ("NRVC procedures").

53.     As described in detail below, the DMV has a policy and practice of exercising its Section 56-25-20 authority to indefinitely suspend driver's licenses after a report of failure to pay a traffic citation without ensuring the license holder is able to pay.  The DMV does this in response to reports of nonpayment, whether the reports are issued by South Carolina courts or by a court or motor vehicle department in another NRVC-participating state.

54.     Section 56-25-20 permits the DMV to impose indefinite license suspensions for failure to comply with a littering summons, but data disclosed by the DMV reveals that the agency does not exercise this authority in practice.  As of November 2018, there was no one with a driver's license suspended indefinitely by the DMV under Section 56-25-20 for failure to comply with a littering summons.

55.     The DMV maintains a list of 92 violations used by the agency to impose indefinite suspensions for failure to pay traffic tickets under Section 56-25-20, which the agency refers to as "FTPTT suspensions."  These NRVC-eligible offenses include low-level traffic violations, such as failure to wear a seatbelt, improper parking, vehicle equipment violations (e.g., "improper lights"), and speeding less than ten miles per hour over the speed limit.  They also include more serious traffic offenses, such as driving under the influence.  The list of

NRVC-eligible offenses also includes violations that are entirely unrelated to traffic safety, such as "failure to change address/name," "log book violation," and disorderly conduct.

56.    NRVC procedures are not used when a defendant in a traffic case pays fines and fees at, or before, their court date.

57.    The NRVC process begins when the DMV receives a report that an individual has failed to comply with a traffic ticket.  Typically, this report is provided to the DMV through the use of a stock Form DL-53 ("Notice of Suspension").[47]  It may also be provided by forwarding to the DMV a copy of the traffic ticket annotated with the term "NRVC."  A copy of the Notice of Suspension follows:

---

[47] *Id.* at § M.3.

**STATE OF SOUTH CAROLINA**

NOTICE OF SUSPENSION
(FAILURE TO RESPOND TO CITATION, APPEAR IN COURT, OR PAY FINE)
THE DEFENDANT HAS FAILED TO RESPOND TO A CITATION OR PAY A FINE FOR THE VIOLATION DESCRIBED HEREIN WITHIN THE PRESCRIBED TIME LIMIT. INITIATE ACTION TO SUSPEND THE DEFENDANTS DRIVER'S LICENSE IN ACCORDANCE WITH THE LAWS OF THIS STATE OR THE PROVISIONS OF THE NONRESIDENT VIOLATOR COMPACT.

FORM DL-53 (REVISED 02-05)    #2 HOME JURISDICTION COPY

MAIL THIS COPY TO:

S.C. DEPT. OF PUBLIC SAFETY
DRIVER'S RECORDS
BOX 1498
BLYTHEWOOD, S.C. 29016-1498

58.     Whether communicated through a Notice of Suspension or an annotated traffic ticket, the entity reporting the failure to comply does not provide the DMV with information demonstrating that any reported noncompliance (such as failure to pay) was willful. Rather, the entity provides identifying information about the citation, defendant, and court that adjudicated

the traffic case, the amount in fines and costs imposed by the court, and the trial date. It also

includes the following boilerplate language: "THE DEFENDANT HAS FAILED TO RESPOND

TO A CITATION OR PAY A FINE FOR THE VIOLATION DESCRIBED HEREIN WITHIN

THE PRESCRIBED TIME LIMIT. INITIATE ACTION TO SUSPEND THE DEFENDANT'S

DRIVER'S LICENSE IN ACCORDANCE WITH THE LAWS OF THIS STATE OR THE

PROVISIONS OF THE NONRESIDENT VIOLATOR COMPACT."

59.    The DMV does not inquire into the basis of any report it receives that a South

Carolina resident or license holder has failed to comply with the terms of a traffic citation.

### ii. The DMV automatically imposes an indefinite driver's license suspension for failure to pay traffic tickets under Section 56-25-20 when it receives a report of failure to pay a traffic ticket.

60.    South Carolina summary courts, which include both magistrate and municipal

courts, do not have a policy or practice of considering or granting requests for continuances

when people are unable to appear in court to respond to a traffic ticket. Instead, summary courts

routinely impose traffic convictions and sentence people to pay fines and fees without the

physical presence of defendants in court—a practice known as "trial in absentia" or "TIA."

61.    Fines and fees imposed through trials in absentia do not reflect consideration of a

defendant's ability to pay because the defendant was not physically present in court to attest to

their financial and life circumstances.

62.    South Carolina summary courts' widespread practice of imposing fines and fees

through trials in absentia contradicts the purpose of South Carolina Code Section 17-25-350.[48]

Section 17-25-350 provides that, at sentencing for an offense punishable by a fine or

imprisonment, the court must permit an indigent defendant to "set up a reasonable payment

---

[48] S.C. Code Ann. § 17-25-350 ("Section 17-25-350").

schedule for the payment of such fine, taking into consideration the income, dependents and necessities of life of the individual."[49]  The statute also provides that "[n]o person found to be indigent shall be imprisoned because of inability to pay the fine in full at the time of conviction."[50]

63.     In a March 2018 memorandum ("OCA Memo"), the South Carolina Office of Court Administration ("OCA") endorsed the use of TIAs for both NRVC-eligible offenses as well as violations that are not supposed to be handled through the NRVC procedures.[51]

64.     The OCA Memo instructs summary court judges to conduct trials in absentia for NRVC-eligible cases "[i]f the citation has not been paid before the court date."[52]  If a defendant is found guilty through a trial in absentia, the OCA Memo instructs summary court judges to report the guilty disposition to the DMV at the end of the day.[53]

65.     Similarly, the OCA Memo authorizes summary court judges to conduct trials in absentia for uniform traffic tickets that do not involve arrest or a bond hearing, as well as zoning violations, animal control violations, city/county ordinance summonses, and courtesy summonses.[54]  If a defendant does not appear in court for these cases, summary court judges are directed to "dispose[] [the case] as TIA" and to send the disposition to the DMV.[55]

66.     After imposing fines and fees in absentia, South Carolina summary courts mail a "Notice of Suspension" or an annotated traffic ticket to the DMV in order to report the individual

---

[49] *Id.*
[50] *Id.*
[51] *South Carolina Court Administration Memorandum from Staff Attorney Renee Lipson to Summary Court Judges and Staff*, Procedures for Disposition of UTTs/Warrants and the Right to Counsel (Mar. 14, 2018), https://bit.ly/2mjjsgt.
[52] *Id*.
[53] *Id*.
[54] *Id*.
[55] *Id*.

for failure to comply.  As described above, the courts do not explain or provide documentation to show the DMV that the individual willfully failed to pay the fines and fees assessed in absentia.

67.    South Carolina summary courts generally do not notify defendants that they have been tried, convicted, and sentenced to pay traffic fines and fees in absentia, even though the South Carolina Summary Court Judges Bench Book provides a stock form titled "Notice of Failure to Comply with Terms of Citation" ("Defendant's Notice") for this purpose.   The Defendant's Notice is almost identical to the Notice of Suspension provided to the DMV but also instructs: "FAILURE TO REMIT THE FINE WITHIN 15 DAYS OF THE DATE SHOWN IN THE LOWER RIGHT CORNER OF THIS NOTICE WILL RESULT IN NOTIFICATION OF THE LICENSING AUTHORITY IN YOUR STATE TO SUSPEND YOUR DRIVER'S LICENSE UNTIL THE FINE HAS BEEN PAID BY CERTIFIED CHECK OR MONEY ORDER."[56]  An example of the Defendant's Notice follows.

---

[56] Defendant's Notice, *infra* ¶ 67.



68.    In practice, however, South Carolina summary courts, out-of-state courts, and motor vehicle departments of other NRVC-participating states rarely, if ever, send the Defendant's Notice or any comparable notice to inform defendants they owe fines and fees imposed in absentia and will be reported to the DMV for noncompliance unless they pay in full. Even if a person receives a Defendant's Notice, the DMV provides no way for that individual to

prevent an indefinite suspension of their driver's license under Section 56-25-20 if the individual

is unable to pay the fines and costs identified within 15 days.

69.     Upon receipt of a Notice of Suspension, the DMV does not inquire into whether

the individual's failure to comply with the sentence to pay fines and fees was willful.

> **iii.    The DMV's "Official Notice" of suspension fails to address any process other than full payment to prevent or contest a driver's license suspension for failure to pay a traffic ticket under Section 56-25-20.**

70.     South Carolina Code Section 56-1-350 provides that "[i]n all cases of . . .

suspension . . . of drivers' licenses, the Department of Motor Vehicles shall notify the licensee . .

. that [their] license has been . . . suspended."

71.     The DMV has a policy and practice of automatically mailing a document called

an "Official Notice" to any South Carolina resident or driver's license holder who is reported for

nonpayment of traffic fines and fees by a South Carolina summary court or a court or motor

vehicle department of an NRVC-participating state other than South Carolina.  Before issuing an

Official Notice, the DMV does not determine that the recipient has willfully failed to pay or to

otherwise comply with their traffic citations.  An example of the Official Notice follows:

28



**South Carolina
Department of Motor Vehicles**

06/13/2017

CARTER, JANICE RENEE

CUSTOMER NO:
FILE NO:
DL NO:

OFFICIAL NOTICE

You may not drive commercial or non-commercial motor vehicles.

REASON: FAILURE TO PAY TRAFFIC TICKET    SECTION OF LAW: 56-25-20

VIOL DATE     TICKET#     VIOLATION
12/07/2016    20163070006917    Speeding - Over 10 MPH

COURT:
YEMASSEE MUNICIPAL COURT
101 TOWN CIRCLE / PO BOX
YEMASSEE, SC 29945
843-589-6315

BEGINNING DATE: 12:01 AM 07/03/2017

ENDING DATE: When you receive notice from the Department that this action has been
cleared.

SPECIAL DRIVING PRIVILEGES:
There are no special driving privileges available to you. You may not drive until you
have done the following:

COMPLIANCE:
Pay the fine for the ticket to the court. When the fine is paid, the court will give
you a compliance notice which shows the description of the violation, the date of the
violation, the date the ticket was paid, and the ticket number. YOU MUST BRING THIS
COMPLIANCE TO YOUR LOCAL DMV OFFICE OR MAIL IT TO DRIVER RECORDS, POST OFFICE BOX
1498, BLYTHEWOOD, SC 29016-0028. NOTE: IT IS YOUR RESPONSIBILITY TO GIVE THE
DEPARTMENT PROOF THAT THIS TICKET HAS BEEN PAID OR THE SUSPENSION MAY REMAIN IN
EFFECT.

REINSTATEMENT FEE:
You must pay a $100.00 reinstatement fee if your compliance notice shows payment on or
after the suspension date. This fee can be paid at any DMV Office, mailed to Driver
Records, PO Box 1498, Blythewood, SC 29016-0028 or paid by credit card online at
www.scdmvonline.com. Make checks and money orders payable to SCDMV. Do not send cash
through the mail.

Your license must be returned to any DMV Office or mailed to Driver Records if this
suspension is not cleared before the suspension date listed above.

THIS NOTICE CONCERNS ONLY THE ACTION LISTED ABOVE AND DOES NOT CHANGE ANY OTHER
NOTICES WE HAVE SENT TO YOU.

Driver Records Manager

72.     The Official Notice is mailed to the individual's last known address, which usually is the address identified on the traffic citation, several weeks before a pending suspension goes into effect.  But many people facing a pending suspension of their driver's license for FTPTT under Section 56-25-20 fail to receive the Official Notice before the suspension goes into effect.

73.     The Official Notice provides that there is a pending Section 56-25-20 suspension for failure to pay traffic fines and fees and indicates the individual "may not drive commercial or non-commercial motor vehicles."[57]  It states "FAILURE TO PAY TRAFFIC TICKET" as the "REASON" for the suspension and identifies the date of the violation, ticket number, offense, name and address of the court, and beginning date of the suspension.

74.     The Official Notice also informs the recipient that the only way to prevent the suspension from going into effect is to "[p]ay the fine for the ticket to the court."  The section of the Official Notice instructing recipients on how to prevent the suspension of a driver's license for failure to pay a traffic ticket or to lift a suspension already in effect reads in full:

> COMPLIANCE:
>
> Pay the fine for the ticket to the court. When the fine is paid, the court will give you a compliance notice which shows the description of the violation, the date of the violation, the date the ticket was paid, and the ticket number. YOU MUST BRING THIS COMPLIANCE TO YOUR LOCAL DMV OFFICE OR MAIL IT TO DRIVER RECORDS, POST OFFICE BOX 1498, BLYTHEWOOD, SC 29016-0028. NOTE: IT IS YOUR RESPONSIBILITY TO GIVE THE DEPARTMENT PROOF THAT THIS TICKET HAS BEEN PAID OR THE SUSPENSION MAY REMAIN IN EFFECT.

75.     The Official Notice instructs the individual to secure a "compliance notice" from the court and to bring this notice to the DMV in order to prevent the suspension from going into effect or, if the suspension is already in effect, to seek license reinstatement.  The Official Notice

---

[57] *See* Official Notice, *supra* ¶ 71.

also makes clear that if the compliance notice indicates payment of the ticket on or after the suspension date, the individual must also pay a $100 reinstatement fee to the DMV.

76.    The only way to secure the compliance notice from the summary court is to pay the traffic fines and fees in full to the court clerk.  The Official Notice thus makes clear that the compliance notice will show "the date the ticket was paid" along with a description and date of the violation and the ticket number.  The individual must bring the compliance notice to the DMV to prevent an indefinite driver's license suspension for failure to pay traffic tickets before the date the suspension goes into effect.  After the indefinite suspension is already in effect, a license holder must provide the DMV with the compliance notice and pay in full the $100 reinstatement fee to the DMV in order to request license reinstatement.

77.    The Official Notice fails to notify license holders who cannot afford to pay any way to prevent or contest an indefinite driver's license suspension for nonpayment of traffic fines and fees under Section 56-25-20 other than payment in full.  It does not detail any process by which to request a payment plan or waiver or reduction of traffic fines and fees owed to the court.  Nor does it describe the availability of such relief for people who are unable to pay.  The Official Notice also fails to detail any process by which a driver's license holder can request waiver of the $100 reinstatement fee imposed after the effective date of suspension if the person is unable to pay that fee.

78.    The Official Notice also fails to indicate whether the individual can request a hearing before any South Carolina agency, administrative body, or court to explain that nonpayment was the result of inability to pay and to request an alternative punishment to indefinite driver's license suspension.

      **iv.    The DMV and OMVH fail to afford any hearing at which a person who is unable to pay can prevent or contest the indefinite suspension of a driver's license for failure to a pay a traffic ticket under Section 56-25-20.**

79.     Section 56-25-20 does not set forth any process, or reference any statutes or rules that set forth any process, by which a person may contest the indefinite suspension of a driver's license for failure to pay a traffic citation, whether before or after the suspension goes into effect.

80.     The only South Carolina statute that could afford a redress process in this situation is South Carolina Code Section 56-1-370, which provides a general administrative process for appealing the DMV's suspension of a driver's license.[58]

81.     Section 56-1-370 provides that "[t]he licensee may, within ten days after notice of suspension, cancellation, or revocation, except in cases where the suspension, cancellation, or revocation is made mandatory upon the Department of Motor Vehicles, request in writing an administrative hearing with the Division of Motor Vehicle Hearings in accordance with the rules of procedure of the Administrative Law Court and the State Administrative Procedures Act . . . ."

82.     Administrative hearings to contest a driver's license suspension under Section 56-1-370 are conducted by the Office of Motor Vehicle Hearings ("OMVH").

83.     Defendant Ralph K. Anderson, the Chief Judge of the South Carolina Administrative Law Court ("ALC"), is the Director of the OMVH and the final decisionmaker on the assignment of cases contesting the DMV's suspension of driver's licenses to OMVH hearing officers.  Defendant Anderson promulgates rules governing OMVH procedure and practice, including the requirements for initiating an administrative action to challenge the DMV's suspension of a driver's license.[59]

---

[58] S.C. Code Ann. § 56-1-370 ("Section 56-1-370").
[59] S.C. Code Ann. § 1-23-660(A).

84.     The Official Notice does not reference Section 56-1-370 or explain to people facing driver's license suspensions for failure to pay traffic tickets under Section 56-25-20 that there is any possibility of an administrative hearing under Section 56-1-370 to contest the suspension.  Nor does it explain the procedures for requesting an OMVH hearing, or even reference the applicable statutes and rules.  Rather, the Official Notice presents full payment of the traffic fines and fees as the only way to achieve compliance and prevent an indefinite FTPTT suspension.

85.     A layperson who carefully reads the Official Notice would not be aware of the possibility of an administrative hearing at which to contest a pending or in-effect suspension for failure to pay a traffic ticket under Section 56-25-20.

86.     Even if a driver who receives an Official Notice independently becomes aware of the availability of an OMVH hearing, the driver would not know the time limit and procedure for making such a request.  The Official Notice does not address Section 56-1-370, which provides that the request for a hearing must be made within ten days of notice of the suspension.  Nor does the Official Notice reference the requirement, under Section 56-1-370, that any request for an OMVH hearing be made "in accordance with the rules of procedure of the Administrative Law Court and the State Administrative Procedures Act . . . ."  Neither the Official Notice nor Section 56-1-370 explain that the Rules of Procedure of the Office of Motor Vehicle Hearings, and not the Rules of the Procedure of the Administrative Law Court, provide the governing rules applicable to requesting and conducting OMVH hearings.

87.      It would be extremely difficult, if not impossible, for a layperson facing an FTPTT suspension under Section 56-25-20 to independently discover Section 56-1-370, the South Carolina Administrative Law Court Rules, and the OMVH Rules to determine how to

timely and properly submit a request for an OMVH hearing within a matter of days of receiving

the Official Notice, particularly because the notice itself lacks any explanation or reference to

these laws, rules, and procedures.

88.    Moreover, Defendant Anderson and the OMVH have erected an insurmountable,

wealth-based barrier to even the possibility that an indigent person can secure an OMVH hearing

to contest an FTPTT suspension under Section 56-25-20 on the basis of inability to pay traffic

fines and fees—whether before or after the suspension goes into effect.

89.    South Carolina Code Section 56-5-2952 establishes that the filing fee for

requesting an OMVH hearing concerning the DMV's suspension of a driver's license is $200 "or

as otherwise prescribed by the rules of procedure for the [OMVH]."  OMVH Rule 21, in turn,

prescribes: "Each request for a contested case hearing before the Office must be accompanied by

a filing fee in the amount established by law.  A case will not be assigned to a hearing officer

until the filing fee has been paid.  This fee is not required for contested cases brought by the

State of South Carolina or its departments or agencies."[60]  OMVH Rules 4(A), 4(C), and 9(A)

also reference the requirement to pay the filing fee in order for a contested case hearing to be

assigned to a hearing officer.[61]

90.    Pursuant to OMVH Rules 21, 4(A), 4(C), and 9(A), even when a person seeking

to contest an FTPTT suspension under Section 56-25-20 independently discovers the OMVH

appeal process and submits a request for a hearing to contest the DMV's decision, the OMVH

refuses to assign a case to a hearing officer unless the requester has paid in full a $200 filing fee

for each contested FTPTT suspension.  It is therefore impossible for an individual who is unable

---

[60] Rules of Procedure for the Office of Motor Vehicle Hearings ("OMVH"), Rule 21 (2011), https://bit.ly/2oznlhW (emphasis supplied).
[61] OMVH Rules 4(A), 4(C), & 9(A).

to pay the $200 filing fee to secure a hearing to explain their inability to pay traffic fines and fees, whether to prevent an FTPTT suspension under Section 56-25-20 from going into effect or to secure reinstatement of their driver's license.

91.    Defendant Anderson, as the Chief Judge of the Administrative Law Court and Director of the OMVH, has the power under South Carolina Code Section 1-23-660 to propose amendments to OMVH Rule 21 to permit waiver and reduction of the $200 filing fee on the basis of financial hardship.  Defendant Anderson also has the power under Section 1-23-660 to propose amendments to OMVH Rules 4(A), 4(C), and 9(A) so that the rules permit the assignment of an OMVH hearing officer to a case even when the applicant is not able to pay the filing fee.  Moreover, Defendant Anderson has the authority and discretion under Section 1-23-660 to directly assign OMVH hearing officers to adjudicate appeals from DMV suspensions even if individuals cannot afford to pay the filing fee.

92.    An indigent person facing an indefinite driver's license suspension under Section 56-25-20 due to inability to pay a traffic ticket thus faces an impossible situation.  The person cannot afford to pay the ticket in order to avert the indefinite suspension of their driver's license. Nor can the person afford to pay for the hearing needed to challenge the indefinite suspension on the basis of their inability to pay.

93.    In practice, the OMVH never adjudicates hearings concerning challenges to FTPTT suspensions on the basis of an individual's inability to pay.

94.    The OMVH's workload reports for Fiscal Year 2016-17 and Fiscal Year 2017-18 do not indicate that the entity has held a single hearing concerning an FTPTT suspension, although nine cases are coded as "Miscellaneous."[62]

---

[62] *See* ALC 2017-18 Accountability Report, *supra* note 4, at A-9.

95.     Moreover, the agency does not believe that inability to pay is a basis for preventing the suspension of a driver's license for failure to pay a traffic ticket under Section 56-25-20 or for securing reinstatement after such a suspension has gone into effect.

> **v.     The DMV's license reinstatement requirements constitute wealth-based punishment.**

96.     According to the plain text of Section 56-25-20, once the DMV has imposed an indefinite driver's license suspension for failure to pay a traffic ticket, the suspension will remain in effect "until satisfactory evidence has been furnished to the [DMV] of compliance with the terms of the [traffic] citation . . . and any further order of the court having jurisdiction in the matter and until a reinstatement fee . . . is paid to" the DMV.[63]  As set forth in the Official Notice, this involves paying the traffic fines and fees owed to the court, obtaining a compliance notice from the court, and providing that notice along with any required reinstatement fees to the DMV.

97.     Under South Carolina Code Section 56-1-390, the DMV must charge a $100 reinstatement fee "for each suspension on [the driver's] record that has not been reinstated."[64] The statute requires payment of all reinstatement fees in full in order for the DMV to reinstate, renew, or issue another driver's license.  Section 56-1-390 does not require consideration of an individual's financial circumstances or a determination of willful nonpayment before the DMV continues to indefinitely suspend a driver's license for failure to pay reinstatement fees.

98.     A driver with multiple driver's license suspensions for failure to pay traffic tickets under Section 56-25-20 would also need to pay several hundred dollars in DMV reinstatement fees before being able to drive legally.

---

[63] S.C. Code Ann. § 56-25-20.
[64] S.C. Code Ann. § 56-1-390.

99.     In addition to being charged reinstatement fees for each FTPTT suspension, drivers are charged reinstatement fees for traffic offenses that lead to time limited suspensions, such as a six-month suspension for operating an unlicensed vehicle or driving under a suspended license.  Thus, an individual who receives multiple traffic tickets can face multiple suspensions, whether for failure to pay a traffic ticket or the related offense of driving on a suspended license. The accumulation of these fees poses a wealth-based barrier to driver's license reinstatement for people who simply cannot pay.

100.    There is no statutory or administrative provision for waiving or reducing the DMV's reinstatement fees.

101.    The DMV has established a driver's license reinstatement fee payment program, which allows some people to secure a temporary driver's license that would permit them to drive legally for six months while repaying DMV reinstatement fees.

102.    The DMV's driver's license reinstatement fee payment program does not provide relief to people with driver's licenses indefinitely suspended for nonpayment of traffic fines and fees they cannot afford.  People who are unable to pay are ineligible because the program is limited to South Carolina residents who are at least eighteen years old, owe at least $300 in reinstatement fees, have served any mandatory suspension periods, and have "met all [other] conditions for reinstatement."[65]  In other words, a person whose license was suspended due to failure to pay traffic tickets would have to submit proof of payment of the underlying traffic fines and fees before they would be eligible for the DMV reinstatement fee payment program.

103.    The DMV's reinstatement fee payment program provides additional wealth-based barriers to participation for indigent people.  Eligible drivers must pay up front a $35

_____

[65] S.C. Code Ann. § 56-1-395(A); *Verify Payment Plan Eligibility*, South Carolina Dep't of Motor Vehicles, https://bit.ly/2oDAAyf (last visited October 28, 2019).

administrative fee and 15% of the total amount of reinstatement fees owed in order to participate in the program.[66] The program is also limited to drivers who owe at least $300 in reinstatement fees.[67] Drivers who cannot pay these upfront costs or who owe reinstatement fees totaling less than $300 cannot participate in the program. The program thus excludes those who are least able to pay.

104.     In the event that a driver in the reinstatement fee payment program is unable to pay off all of the driver's reinstatement fees in the designated six-month period, there is no statutory requirement for an ability-to-pay determination before reactivation of the suspensions that were on hold during this period.

### C. Plaintiffs suffer ongoing harm from the absolute and lasting suspension of their driver's licenses because of their inability to pay traffic fines and fees.

#### i.     Ms. Emily Bellamy

105.     Plaintiff Emily Bellamy lives in Conway, South Carolina.  She is a single mother and primary caregiver to her four children, all of whom are under seven years old.  Her driver's license is currently suspended because she cannot afford to pay fines and fees for four traffic tickets and reinstatement fees.  Although she works full-time at a children's daycare facility, she is unable to earn enough to support her family.  Because her driver's license is suspended for failure to pay traffic tickets and reinstatement fees, Ms. Bellamy is unable to secure higher-paid work in hotel housekeeping or as a home health aide.

106.     In 2017, Ms. Bellamy held two part-time jobs to support herself and her children. She was a supervisor for Jani King Services, a housekeeping service for hotels and condominiums in Myrtle Beach, South Carolina.  She also worked as a home health aide for

---

[66] *Id.*
[67] *Id.*

WeCare Homecare and Carolina Health Force.  As a home health aide, she assisted disabled and elderly individuals with daily living activities.

107.    On February 8, 2018, Ms. Bellamy was ticketed for speeding in Georgetown County while driving to buy supplies to make a celebratory meal for her daughter's birthday.

108.    Ms. Bellamy was unable to find someone to cover her at work so that she could attend her court hearing.

109.    In February 2018, she called the Georgetown County Central Traffic Court to request a continuance of the hearing.  Ms. Bellamy was told that a continuance would be granted and that she would receive notice of the new date in the mail.  But, she never received notice of a new court date.

110.    On April 17, 2018, the Georgetown County Central Traffic Court tried Ms. Bellamy in her absence.  The court found her guilty of speeding and sentenced her to pay $76.50. Ms. Bellamy did not receive notice that she was convicted in absentia and sentenced to pay this amount.

111.    On May 29, 2018, while driving from a client's home back to the main office of Carolina Health Force in Horry County, Ms. Bellamy was involved in an accident with multiple vehicles and was issued three traffic tickets.  She was ticketed for operating a motor vehicle without a license in possession, operating an uninsured motor vehicle, and following too closely. These tickets totaled $665 in possible fines.

112.    The officer who issued these tickets also informed Ms. Bellamy that the DMV had not been able to verify her car insurance.  This was the first time Ms. Bellamy learned that there was an issue with her car insurance.  Ms. Bellamy had not received notice from the DMV about any lapse in her car insurance.

113.    In early 2017, the father of Ms. Bellamy's children had agreed to make payments for her car insurance in lieu of paying child support. He had not made any child support payments for a long time. The father of Ms. Bellamy's children appeared to have kept up with the car insurance payments for over a year, but did not inform Ms. Bellamy that he had stopped paying.

114.    Ms. Bellamy's van sustained significant damage in the accident and was towed to an auto body shop.

115.    Ms. Bellamy went to the auto body shop on the day after the accident. She learned she was required to pay $305 to retrieve the van. Because she could not pay $305, she left the van at the auto body shop.

116.    Ms. Bellamy also visited the doctor's office soon after the accident to check that she had not sustained any internal injuries. During the visit, she was informed that she was pregnant with her fourth child and that the pregnancy was high risk.

117.    After the accident, Ms. Bellamy was no longer able to drive to job sites for Jani King Cleaning Services or Carolina Health Force. Although she was able to formally remain a part-time employee of both companies for some time, she was not able to work for the companies because she could not drive and did not receive any income from them.

118.    Ms. Bellamy was concerned with how to manage a four-person household without the ability to drive and with three young children and another child on the way.

119.    Ms. Bellamy foresaw that she would be unable to get to her traffic court hearing in August. In June 2018, she called the Conway Municipal Court to ask for a continuance. Ms. Bellamy was told that she would receive a continuance and notice of the date of the new court hearing in the mail. But she did not receive any notice about the new court date.

120.    On July 8, 2018, the DMV suspended Ms. Bellamy's driver's license for failure to pay the February 2018 speeding ticket received in Georgetown.  The DMV charged her an additional $100 reinstatement fee for this suspension.

121.    In August 2018, both Jani King Cleaning Services and Carolina Health Force terminated Ms. Bellamy's employment.  Because she had been unable to come to work, both companies had assigned other employees to service Ms. Bellamy's former clients and job sites.

122.    On August 29, 2018, the Conway Municipal Court tried Ms. Bellamy in her absence for the three tickets received in May 2018.  She was found guilty and sentenced to pay $665.  Ms. Bellamy was unaware that she had a court hearing on that date.

123.    The DMV placed another two suspensions on Ms. Bellamy's license on August 26, 2018 and on September 25, 2018.  These were related to the ticket for operating an uninsured motor vehicle and the lapse in her car insurance, of which Ms. Bellamy only became aware after the car accident in Horry County.  The DMV charged Ms. Bellamy at least $905 in reinstatement fees related to these suspensions.  She did not receive notice from the DMV about these suspensions and the reinstatement fees.

124.    On December 6, 2018, the DMV placed three additional suspensions on Ms. Bellamy's driver's license for failure to pay traffic tickets based on the three tickets received in May 2018.  The DMV charged Ms. Bellamy $300 in reinstatement fees related to these suspensions.  She did not receive notice from the DMV about these suspensions and the reinstatement fees.

125.    By the end of December 2018, Ms. Bellamy was still unable to secure work that did not require driving.  Without income, she was barely able to support her family and obtain the medical care needed for her high-risk pregnancy.  She was unable to pay the fines on four

traffic tickets, which totaled $741.50, and the DMV reinstatement fees, which totaled at least $1,305.

126.    In February 2019, Ms. Bellamy's youngest son, K.B., was born.  Although she felt joyful about this new arrival, it also brought additional expenses.

127.    K.B.'s doctor was located in Myrtle Beach, approximately 20 miles away from Ms. Bellamy's home in Conway.  Without a driver's license and car, Ms. Bellamy had to spend time arranging for transportation provided by Medicaid to take her son to the doctor, which was required six times during his first year.

128.    On several occasions, Ms. Bellamy has had to scramble to find transportation to take her children to and from needed medical care.

129.    When K.B. was three months old, he contracted a virus, and Ms. Bellamy secured transportation through Medicaid to take him to the doctor.  Once Ms. Bellamy and her son were at the doctor's office, however, the Medicaid transportation provider indicated they would need to wait three hours in order to be picked up and taken home.  Luckily, Ms. Bellamy was able to secure a ride home from the doctor's office with her cousin.

130.    On another occasion, when K.B. was around five months old, he had a high temperature.  Ms. Bellamy was able to secure transportation to take him to the doctor's office.  Once there, she was instructed to immediately take K.B. to the hospital.  Ms. Bellamy called the Medicaid transportation provider, but was informed that the provider could not take her to the hospital.  Ms. Bellamy called her mother, who fortunately was able to come to the doctor's office in Carolina Forest and transport Ms. Bellamy and her son to the hospital.  In order to return home, Ms. Bellamy had to call her cousin for a ride.

131.     In the spring of 2019, Ms. Bellamy was informed that $25 was garnished from her income tax refund to pay for part of the fine for the Georgetown speeding ticket.

132.     In April 2019, Ms. Bellamy finally found employment at a child daycare to which she could travel without driving herself.  Ms. Bellamy also pays a monthly fee to have her three younger children use the daycare facility at which she works.

133.     From April 2019 to the middle of October 2019, Ms. Bellamy's boss was willing to drive Ms. Bellamy's daughter, J.B., to school in the mornings and then to take Ms. Bellamy and her three younger children to the daycare facility, where Ms. Bellamy works.  Ms. Bellamy's boss was also willing to drive Ms. Bellamy and her children to their home at the end of the work day.  Since late October 2019, however, Ms. Bellamy's boss is no longer able to assist Ms. Bellamy with her commute.

134.     Now, Ms. Bellamy must pay for transportation to get her daughter to school and to take herself and her children to the daycare facility.  In the morning, she pays for a car or taxi to take her and the entire family to drop J.B. off at school and then to take her and her younger children to the daycare facility.  While Ms. Bellamy's boss provides transportation to get J.B. from school to the daycare facility, Ms. Bellamy then must pay for another car or taxi to get her and her children home from the daycare facility.  There is no adequate public transportation Ms. Bellamy can use instead of a car or taxi to make these trips.

135.     In June 2019, Ms. Bellamy called the Conway branch of the DMV to see if there was any way for her to get her driver's license back.  She was directed to the DMV website.  On the DMV website, Ms. Bellamy clicked on a button referencing payment plans for DMV reinstatement fees.  She received a message that she was ineligible for the payment plan.  Ms. Bellamy did not understand that the payment plan she was looking into only concerned

repayment of DMV reinstatement fees. The DMV website provided no explanation as to why she was ineligible for a reinstatement fee payment plan.

136.    Ms. Bellamy's low wages as a children's daycare worker are not enough to cover expenses for herself and her family and to pay her traffic fines and reinstatement fees.  Each month, Ms. Bellamy must pay for rent, childcare, groceries for her family, utilities, phone service, household supplies, personal care/hygiene needs, milk products for her youngest son, transportation, and medicine for her family.  Ms. Bellamy also needs to pay for clothing for her four children because they are young and continually grow out of their clothes.

137.    Ms. Bellamy could work to earn more money to cover these expenses and provide for her family if she could legally drive.  If she had a valid driver's license, Ms. Bellamy would be able to drive to Myrtle Beach on the weekends to work in housekeeping with her former employer, Jani King Cleaning Services.  That position, however, requires the ability to drive between various job sites and to transport heavy linens, cleaning products, and rags between the sites.  Similarly, with a valid driver's license, Ms. Bellamy could seek work as a home health aide.  Ms. Bellamy is thus barred from earning money through work she could otherwise pursue because her driver's license is suspended for failure to pay traffic fines and fees under Section 56-25-20 and for failure to pay reinstatement fees.

138.    Additionally, without a driver's license, Ms. Bellamy is unable to visit and help her mother, who lives with HIV.  Before she learned her driver's license was suspended, Ms. Bellamy would visit her mother every Sunday and at other times during the week, when her mother was ill or needed assistance.  Ms. Bellamy's mother resides in Longs, South Carolina, which is located approximately 21 miles away from Ms. Bellamy's home in Conway.  It is about

a 30-minute drive from Ms. Bellamy's home to her mother's home and there is no reliable public transportation for this trip.

139.    The suspension of her driver's license also affects Ms. Bellamy's ability to ensure that her family has consistent and reliable access to healthcare.  The pediatrician for Ms. Bellamy's children is located in Myrtle Beach, South Carolina because she was unable to find a pediatrician in Conway who would accept Medicaid and take new patients.  When any of her four children require medical attention, Ms. Bellamy has to rely on rides from friends or family or pay for a car or taxi.  With her very limited income, she cannot afford to pay for car or taxi rides to Myrtle Beach, which is located about 16 miles away from Conway.

140.    Because her driver's license is suspended, Ms. Bellamy is also unable to take her children to community and extracurricular events.  Her six-year-old daughter's school hosts a number of community activities, including school plays and family reading events, which require staying late at school.  J.B. cannot participate in these events because Ms. Bellamy does not have a driver's license and cannot bring her daughter home after the events due to inadequate public transportation.  Similarly, Ms. Bellamy's sons do not participate in youth football at a local recreational facility because Ms. Bellamy's suspended driver's license makes it difficult to travel to and from that facility.

141.    Ms. Bellamy was an active participant in a number of volunteer and community groups before her driver's license was suspended for failure to pay a traffic ticket.  This included Family Outreach, a non-profit organization whose goal is to help build strong families by providing support and education for young mothers.  Ms. Bellamy has missed the last two Family Outreach meetings because it was too difficult to arrange for transportation for herself and her children to get to the meetings.  Ms. Bellamy also used to volunteer for the Salvation

45

Army and Helping Hands.  Because her driver's license is suspended, Ms. Bellamy is unable to participate in any of these activities.

### ii.  Ms. Janice Carter

142.  Plaintiff Janice Carter lives in North Charleston.  She is an Air Force veteran and mother of two children, who are now adults.  Her driver's license is currently suspended because she cannot afford to pay fines and fees for several traffic tickets and reinstatement fees.  Yet, because her driver's license is suspended, Ms. Carter is unable to accept a higher paying job that her supervisor has indicated will be offered to her contingent on securing a valid driver's license.  This new position would enable her to pay her traffic debt.

143.  Ms. Carter is an Air Force veteran, who served for twelve years as a public health journeyman.

144.  Following her honorable discharge from the military, Ms. Carter worked in several jobs before starting her own business.

145.  From 2013 to 2016, Ms. Carter operated a small business, Immaculate Cleaning, which provided residential and commercial cleaning services.  The business shut down in late 2016, leaving Ms. Carter without a stable source of income.

146.  Since 2016, Ms. Carter has struggled to find and maintain stable, full-time employment and to support herself financially.

147.  Ms. Carter worked for Sam's Southern Eatery, a soul food restaurant in North Charleston from 2017 to April 2018.  She earned less than $1,000 per month, and her paychecks were routinely delayed.

148.    Between April 2018 and July 2019, Ms. Carter was only able to secure sporadic, short-term, and part-time work in residential cleaning, marketing, babysitting, and hotel laundry. These positions failed to provide her with sufficient income to meet her basic needs.

149.    In 2018, Ms. Carter earned only $5,360—an annual income well below the relevant Federal Poverty Guideline for her household size.

150.    In July 2019, Ms. Carter secured part-time work in human resources for A Second Chance Resource Center ("ASCRC"), an organization that assists people involved in the criminal legal system and their families as well as people struggling with substance abuse.

151.    Even with this new job, Ms. Carter struggles to support herself financially and to pay off her debts.

152.    While Ms. Carter experienced financial hardship and unstable employment, her driver's license was suspended for failure to pay traffic tickets under Section 56-25-20.

153.    Since 2017, the DMV imposed four separate indefinite suspensions on Ms. Carter's driver's license under Section 56-25-20 due to her inability to pay traffic fines and fees. Each suspension remains indefinitely in place because Ms. Carter cannot afford to pay all of the traffic fines and fees and DMV reinstatement fees without compromising her housing, other debt payments, and other basic needs.

154.    These four failure-to-pay suspensions in turn have prevented Ms. Carter from finding and maintaining steady, full-time employment that would enable her to pay the fines and fees she owes to courts and the DMV.

155.    In August 2019, ASCRC indicated that it was prepared to offer Ms. Carter a position as a case manager contingent upon demonstration that she has a valid driver's license and completion of background and reference checks.  While the position could provide Ms.

47

Carter with a substantially higher income, it requires a valid driver's license because case managers must drive to meet ASCRC clients at their homes throughout Berkeley, Dorchester, and Charleston counties.

156.    Ms. Carter cannot accept the ASCRC case manager position because her driver's license remains indefinitely suspended for failure to pay traffic fines and fees under Section 56-25-20.

157.    Ms. Carter needs a driver's license to reliably get to work, church, and medical appointments.  None of her family members, friends, and colleagues are able to consistently transport her to and from work, church, or medical appointments.  There is limited public transportation that Ms. Carter can use to get to work, church, and medical appointments.  Further, Ms. Carter cannot consistently afford to pay anyone to drive her to or from work, church, or medical appointments.

158.    For example, it would take Ms. Carter hours to travel by foot and bus each day to many of the places where she works part-time in her effort to make ends meet.

159.    It takes Ms. Carter more than two hours and thirty minutes to travel by foot and bus simply to get from her home to the church where she attends services and cleans one day a week to earn income.  There is no public transportation that will take her from her home to the church on Sunday mornings so that she can arrive in time to attend services.   As a result, Ms. Carter must frequently choose between paying for a car ride to go to church in order to worship and to earn needed income and staying at home and foregoing both her religious practice and income from this part-time work.  When returning home from church, if Ms. Carter cannot secure transportation from a family member or friend, she must either pay for a car ride or spend

more than two hours and thirty minutes traveling the same route by foot and using three public buses.

160.    It takes Ms. Carter more than an hour to travel by foot and bus to and from her home to the location where she attends a weekly meeting for the part-time work she does for a marketing company.

161.    ASCRC serves people living in Charleston, Dorchester, and Berkeley Counties. ASCRC case managers are required to make home visits to three to five ASCRC clients each day.  It would take Ms. Carter numerous hours each day, at a minimum, to travel by foot and bus from her home or the ASCRC office, both of which are located in North Charleston, to the homes of clients spread out in Charleston, Dorchester, and Berkeley Counties, which span forty miles.  Because the distances are so great, a valid driver's license is a requirement of the job, and Ms. Carter therefore cannot accept the position.

162.    Ms. Carter's cycle of traffic debt and driver's license suspension began on December 7, 2016, when she received a speeding ticket while driving through Yemassee, South Carolina, on her way to visit her son, who was living with his father in Florida at the time.

163.    Ms. Carter was scheduled to appear at the Yemassee Municipal Court on February 16, 2017, for this ticket. She was unable to pay the $129 fine before the court date due to financial hardship related to the closure of her business and lack of other income.

164.    Ms. Carter missed the court date because she was experiencing a tumultuous period in her life.

165.    On February 16, 2017, the Yemassee Municipal Court tried Ms. Carter in her absence and sentenced her to pay $129.  Without Ms. Carter's knowledge, the court notified the

DMV of her nonpayment.   The notice does not provide the DMV any information showing that Ms. Carter willfully failed to pay.  The DMV received this notice on May 23, 2017.

166.     The Yemassee Municipal Court did not notify Ms. Carter that she had been tried in absentia and sentenced to pay $129.  Nor did the DMV notify Ms. Carter that her driver's license would be suspended for failure to pay the $129 fine.

167.     On June 13, 2017, the DMV indefinitely suspended Ms. Carter's driver's license for failure to pay a traffic ticket under Section 56-25-20.

168.     Because Ms. Carter never received an Official Notice from the DMV, she continued to drive without knowing that her driver's license was suspended.

169.     In 2018, Ms. Carter faced additional financial burdens because she needed to travel to Florida to care for her son, who required surgery to repair a hernia.  In order to make these trips for his care, Ms. Carter cut back her hours at Sam's Southern Eatery and the residential cleaning and marketing jobs on which she had been relying for income.

170.     On January 19, 2018, Ms. Carter was ticketed for speeding in Jacksonville, a city in Duval County, Florida, while driving her son to a medical appointment related to his surgery. The officer who issued the ticket did not inform Ms. Carter that her driver's license was suspended.

171.     Ms. Carter was unable to attend the February 20, 2018 court hearing on the speeding ticket.  She could not arrange her schedule at Sam's Southern Eatery so that she could travel back to Florida to attend court without missing work.  Nor could Ms. Carter afford to pay the $129 fine before the hearing because of her limited income through part-time work.

172.     On February 20, 2018, the Traffic Violations Bureau of the Duval County Court tried Ms. Carter in absentia, convicted her of speeding, and sentenced her to pay $129.  Without

Ms. Carter's knowledge, the Duval County Court Clerk notified the DMV that she failed to pay the speeding fine. The DMV received this notice on February 26, 2018.

173.    The notice to the DMV did not provide any information showing that Ms. Carter willfully failed to pay the speeding fine to Duval County Court.

174.    On April 2, 2018, the DMV indefinitely suspended Ms. Carter's driver's license under Section 56-25-20 for failure to pay the fine.

175.    Ms. Carter did not receive an Official Notice indicating that her driver's license would be suspended under Section 56-25-20 for nonpayment of a traffic fine to the Duval County Court.  As a result, she was unaware of this suspension.

176.    On August 15, 2018, Ms. Carter was ticketed in Ravenel, South Carolina, for driving a car with a defective headlight and for driving on a suspended license ("DUS").  The officer who conducted the traffic stop informed Ms. Carter that her license was suspended.  This traffic stop was the first time Ms. Carter learned that her driver's license had been suspended.

177.    Ms. Carter went to the DMV and asked what could be done to lift the suspensions on her driver's license.  A DMV employee informed Ms. Carter that her driver's license was suspended for nonpayment of traffic fines owed for the Yemassee ticket and the Jacksonville, Florida ticket.  The DMV employee also informed her that she was required to pay in full the fines and fees for the tickets and to pay the DMV a $100 reinstatement fee for each suspension before the suspensions would be lifted.

178.    Ms. Carter was unable to attend her hearing in the Ravenel Magistrate Court on December 20, 2018, because the court is located nearly 25 miles from her home and she was unable to secure a ride to court or to pay someone to drive her there.

179.    Ms. Carter's court hearing was scheduled for 9:00 a.m.  There is no reliable public transportation between Ms. Carter's home and the Ravenel Magistrate Court that would permit her to arrive in time for a 9:00 a.m. court hearing.

180.    Due to her financial hardship, Ms. Carter was unable to pay the $647 fine for the DUS ticket and the $232.50 fine for the defective headlight ticket before her court date in the Ravenel Magistrate Court.

181.    The Ravenel Magistrate Court tried Ms. Carter in absentia for the DUS and defective headlight charges on December 20, 2018, and sentenced her to pay $879.50 in fines and fees.

182.    The Ravenel Magistrate Court forwarded two Notices of Suspension to the DMV on January 22, 2019, indicating that Ms. Carter had failed to comply with the traffic tickets for DUS and defective headlight ticket.  The DMV received the notices on January 25, 2019.  The notices did not, however, provide any information showing that Ms. Carter willfully failed to pay.

183.    Around January or February 2019, Ms. Carter received two Official Notices dated January 29, 2019 from the DMV.  These Official Notices indicated that Ms. Carter's driver's license would be suspended under Section 56-25-20 for failure to pay traffic tickets for the defective headlight and DUS violations.

184.    The Official Notices sent to Ms. Carter stated that she must pay the traffic fines and fees in full by February 18, 2019, in order to prevent her driver's license from being suspended for failure to pay traffic tickets.[68]

---

[68] As described and shown above, the section of the Official Notice instructing Ms. Carter on how to lift the suspension reads in full:

185.    On February 18, 2019, the DMV imposed two additional, indefinite suspensions on Ms. Carter's driver's license for failure to pay fines and fees for the defective headlight and DUS violations.

186.    Ms. Carter is unable to pay the $1,137.50 she owes in traffic fines and fees.  Nor can she afford to pay the additional $400 in reinstatement fees imposed by the DMV for the FTPTT suspensions on her license.

187.    Ms. Carter also owes the DMV a $100 reinstatement fee for a 6-month DUS suspension.

188.    Because Ms. Carter cannot afford to pay a total of $1,637.50 in traffic fines and reinstatement fees owed to courts and the DMV, the DMV continues to indefinitely suspend her driver's license for failure to pay traffic tickets under Section 56-25-20.

189.    Ms. Carter remains unable to accept the case manager position at ASCRC because her driver's license is suspended for failure to pay traffic fines and fees under Section 56-25-20 and for failure to pay reinstatement fees.

### iii.  Ms. Linquista White

190.    Linquista White lives in North Charleston, South Carolina, and is a single mother and the primary caregiver for her nine-year old daughter.  She also provides transportation to her 17-year old god daughter after school when her god daughter's father is unavailable to drive her

---

COMPLIANCE:

Pay the fine for the ticket to the court. When the fine is paid, the court will give you a compliance notice which shows the description of the violation, the date of the violation, the date the ticket was paid, and the ticket number. YOU MUST BRING THIS COMPLIANCE TO YOUR LOCAL DMV OFFICE OR MAIL IT TO DRIVER RECORDS, POST OFICE BOX 1498, BLYTHEWOOD, SC 29016-0028. NOTE: IT IS YOUR RESPONSIBILITY TO GIVE THE DEPARTMENT PROOF THAT THIS TICKET HAS BEEN PAID OR THE SUSPENSION MAY REMAIN IN EFFECT.

to school or other appointments.  The DMV indefinitely suspended her driver's license under

Section 56-25-20 in the past because she could not afford to pay fines and fees for a traffic ticket

and the corresponding $100 reinstatement fee.  Although Ms. White recently secured

reinstatement of her driver's license by diverting money needed to replace belongings damaged

in a wrongful eviction, she faces a substantial risk that her driver's license will be imminently

subjected to additional, indefinite FTPTT suspensions because she cannot pay recent traffic

tickets incurred as a result of her limited financial resources.

191.    Ms. White has experienced financial difficulties since losing her job as a school

nurse in 2012.  At the time, she was raising and financially supporting three children while

unemployed.

192.    After months of unemployment, Ms. White began working at the Medical

University of South Carolina ("MUSC"), where today she works as a pre-certification specialist.

In this position, Ms. White acts as a liaison to insurance companies regarding billing matters.

193.    Despite securing a position at MUSC, Ms. White has struggled to support herself

and her family.  She filed for bankruptcy in 2013 because her income was insufficient to make

payments toward debts incurred during her unemployment, as well as her car loan, car insurance,

childcare, and other household expenses.

194.    Ms. White's bankruptcy debt was officially discharged in November 2018.  From

2013 to 2018, a portion of Ms. White's paycheck at MUSC was garnished to make payments to

her bankruptcy trustee.  In total, more than $17,000 of Ms. White's wages were garnished and

provided to the bankruptcy trustee during those five years.

195.    Ms. White has very little money left each month from her paychecks after meeting her household's monthly expenses, which include rent, electricity, phone payments, car payments, groceries, loan payments, childcare, and medical expenses.

196.    Because of her financial difficulties, Ms. White has missed car insurance payments, and at times her insurance has lapsed.

197.    In October 2016, Ms. White was ticketed for operating an uninsured motor vehicle.  While she was eventually able to file proof of insurance and lift the subsequent suspension on her driver's license for failure to maintain insurance, this incident caused her car insurance costs to increase.

198.    Ms. White continued to struggle to make regular payments toward car insurance. In February 2018, Ms. White was notified by her insurance company that her policy was cancelled.

199.    In March 2018, Ms. White paid her annual automobile taxes, which triggers automatic vehicle registration renewal in South Carolina.

200.    On June 8, 2018, without notifying Ms. White, the DMV suspended her driver's license for failure to have valid car insurance at the time of automobile registration or renewal. The DMV charged Ms. White a $400 fee for this suspension, which consists of a $200 reinstatement fee and a $5 per day penalty up to $200 for every day that Ms. White was not covered by liability insurance.

201.    Despite her difficulties paying for car insurance in 2018, Ms. White continued to drive because she had no alternative transportation for getting to and from work on time while also carrying out her responsibilities to shop for groceries and to transport her daughter and god

daughter to and from school, school activities, and health care appointments.  During this time, Ms. White was the primary caregiver for both her daughter and god daughter.

202.    On September 4, 2018, Ms. White was stopped in James Island, South Carolina while driving her god daughter to school. The officer who stopped Ms. White informed her that her driver's license had been suspended due to the DMV's inability to verify her insurance information.  She was issued a ticket for driving under a suspended license, first offense ("DUS-1").

203.    Between this stop and her first court appearance in October 2018, Ms. White visited the DMV to find out how to lift the insurance-based suspension of her driver's license.  A DMV representative informed her that she had to obtain vehicle insurance and pay reinstatement fees to the DMV.  Ms. White did not have enough money to pay for insurance or reinstatement fees to the DMV at that time.

204.    Ms. White appeared in the James Island Magistrate Court to answer for the DUS-1 ticket on October 30, 2018.  The prosecuting police officer told her that he would be open to reducing or dismissing the charge if Ms. White returned at her next court date with evidence that she was working on obtaining insurance and paying the DMV reinstatement fees and penalties related to the insurance lapse.  The court set her next appearance date for January 15, 2019.

205.    Despite Ms. White's efforts, she could not come up with the money to reinstate her driver's license before the January 2019 hearing.

206.    Nor could Ms. White attend her court hearing in the James Island Magistrate Court on January 15, 2019.  Ms. White could not find a ride to the courthouse or pay for a car or taxi ride.  Ms. White was also scared that if she took the risk of driving on a suspended license to

the courthouse, she would be stopped again and would receive additional tickets, fines, and even possibly jail time.

207.    The James Island Magistrate Court tried Ms. White in absentia on January 15, 2019, and sentenced her to pay a $647 fine.

208.    Without Ms. White's knowledge, the court notified the DMV of her nonpayment of the DUS-1 ticket.  The notice does not provide any information showing that Ms. White willfully failed to pay.

209.    The James Island Magistrate court did not notify Ms. White that she had been tried in absentia and sentenced to pay $647.  Nor did Ms. White receive any notice from the DMV informing her that her driver's license would be suspended for failure to pay a traffic ticket under Section 56-25-20.

210.    On March 24, 2019, the DMV indefinitely suspended Ms. White's driver's license under Section 56-25-20 for failure to pay a traffic ticket.  The DMV also imposed a $100 reinstatement fee related to this suspension.

211.    In March 2019, Ms. White called the James Island Magistrate Court to request a payment plan for the DUS-1 fine.  She was informed that the payment plan would not cause her driver's license to be reinstated.

212.    While Ms. White's driver's license was suspended, she was the primary financial provider for her daughter and god daughter.  During that time, she faced the impossible choice of not driving and failing to get to and from work while also meeting her responsibilities for her family, or driving and risking further penalties, including additional traffic tickets, fines, and potentially jail time for driving on a suspended license.  At times, Ms. White drove because she

had no alternative transportation for getting to and from work while also running errands and taking her daughter and god daughter to school, school activities, and health care appointments.

213.    On July 15, 2019, Ms. White received three traffic tickets when she was on her way to work after dropping her god daughter off at a relative's house.  She was ticketed for a second offense of having an uninsured motor vehicle, which carries a $440 fine; for driving without a driver's license, which carries a $232 fine; and for a second offense of driving under suspension (DUS-2), which carries a $1,270 fine.  These three tickets are directly related to Ms. White's limited financial circumstances.

214.    In order to resolve the tickets without going to court, Ms. White must pay a total of $1,942 in fines.

215.    Throughout her financial struggles in 2018 and 2019, Ms. White sometimes fell behind on paying rent.

216.    On August 5, 2019, marshals evicted Ms. White from her apartment based on her landlord's error.  Some of her belongings were damaged or stolen as a result of the eviction.

217.    In September 2019, Ms. White's landlord paid her some money to compensate her for loss of her personal belongings during the eviction.

218.    Although Ms. White needed to replace her damaged belongings, she used a significant portion of the money from her landlord to pay for car insurance, the fines for the traffic ticket that led to the FTPTT suspension on her driver's license, the $100 reinstatement fee, and other debts. The payment was not enough, however, for Ms. White to pay the $1,942 needed to resolve the July 2019 traffic tickets without going to court.

219.    Ms. White's court date for the July 2019 traffic tickets was set for September 18, 2019.  That hearing date was adjourned because Ms. White's public defender requested a jury trial.  Ms. White is awaiting another scheduled court date.

220.    If Ms. White is found guilty of the three traffic violations, she faces up to $1,942 in fines and may also be charged fees, including a statutorily mandated three percent collection fee for placement on a payment plan.

221.    Because Ms. White is unable to pay the fines and fees associated with the three traffic tickets, she faces an imminent and substantial risk that the DMV will indefinitely suspend her driver's license.

222.    Ms. White's job at MUSC is located six miles away from her home.  She has no family members, friends, or colleagues who would be able to consistently or reliably transport her to and from work and the grocery store and to take her daughter and god daughter to school, medical appointments, and other activities, if her driver's license is suspended again.

223.    There is limited public transportation for Ms. White to get from home to the locations to which she must travel as head of a household, which include her daughter's and god daughter's schools and her own place of employment.  Ms. White also cannot afford to pay anyone to drive her to or from work, the grocery store, or medical appointments, or to take her daughter and god daughter to their schools, medical appointments, and other activities.

224.    Without a driver's license, Ms. White will be unable to complete her morning commute.  Depending on the time of morning, it would take Ms. White around twenty to thirty minutes to walk, or to take a bus and walk, from her home to her daughter's school, which is located approximately two miles away from Ms. White's home.  She would then need to take three different buses and to travel for almost two hours (assuming no delays) from her daughter's

school to her job at MUSC, which is located approximately seven miles from Ms. White's daughter's school.  As a result, Ms. White would be unable to drop her daughter off at school and report to work on time without driving.

225.    Similarly, without driving, Ms. White is unable to commute home.  Her commute home can involve leaving MUSC, picking up her daughter and god daughter from their respective schools, dropping her god daughter off at her home, and returning to Ms. White's home.  Her evening commute can also involve taking her daughter and god daughter to various school activities, as needed, before returning home.

226.    If Ms. White's driver's license is again suspended for failure to pay traffic tickets under Section 56-25-20, she will be forced to make the same impossible choice she has made in the past: drive under suspension, and risk additional fines and fees, driver's license suspensions, jail, and other criminal penalties, or refrain from driving, risk losing her job, and jeopardize the well-being of her family.

> **D.  South Carolina has failed to afford Plaintiffs any process by which to appeal the DMV's indefinite suspension of their driver's licenses for failure to pay traffic tickets under Section 56-25-20.**

227.    Plaintiffs Carter and White submitted written requests to the Office of Motor Vehicle Hearings seeking hearings to contest the DMV's continued suspension of their driver's license under Section 56-25-20 despite their inability to pay the traffic fines and fees that were the basis of the suspensions for failure to pay traffic tickets.  These requests were submitted in person at the OMVH office in Columbia, South Carolina, and a copy of each request was mailed to the DMV.  Ms. Carter and Ms. White also submitted requests for a waiver of the $200 filing fee along with a financial statement demonstrating their inability to pay the filing fee.

228.     The OMVH denied Ms. Carter and Ms. White's requests for a hearing on the basis that they failed to pay the $200 OMVH filing fee for each contested driver's license suspension as required by the OMVH Rules and Section 56-5-2952.

229.     On July 1, 2019, Ms. Carter submitted a written request to the OMVH for a consolidated contested case hearing concerning the DMV's continued suspension of her driver's license for FTPTT under Section 56-25-20.  The submission explained that Ms. Carter was unable to pay fines and fees related to four traffic tickets that led to the FTPTT suspensions.  It also included a request for waiver of the $200 OMVH filing fee and a statement providing Ms. Carter's financial information and attestation that she cannot afford to pay the OMVH filing fee.

230.     By letter dated July 3, 2019, Ester F. Haymond, Senior Staff Counsel at the OMVH provided Ms. Carter a written denial of her request for an OMVH hearing.  The letter stated: "The OMVH filing fee is set by statute and there is not a waiver provision in statute or the OMVH rules.  Therefore, a request must be accompanied by the $200 filing fee.  Further, we are unable to consolidate suspensions into one contested case hearing.  Accordingly, each case must be accompanied by a filing fee."  The letter also noted: "Please be advised that pursuant to S.C. Code Ann. Section 56-1-370, a hearing must be filed within ten days of notice of the suspension."

231.     On August 19, 2019, Ms. White submitted a written request to the OMVH for a consolidated contested case hearing concerning the DMV's continued suspension of her driver's license for FTPTT under Section 56-25-20.  The submission explained that Ms. White was unable to pay fines and fees related to a 2018 traffic ticket that led to the FTPTT suspension.  It also included a request for waiver of the $200 OMVH filing fee and a statement providing Ms. White's financial information and attestation that she cannot afford to pay the OMVH filing fee.

232.    On August 29, 2019, Ms. Haymond responded to Ms. White's request for a hearing by confirming that the request would not be processed without payment of the associated filing fee.

## CLASS ALLEGATIONS

233.    Plaintiffs bring this case as a class action on behalf of themselves and all others similarly situated for the purpose of asserting declaratory and injunctive relief claims on a common basis.

234.    Plaintiffs seek to certify two separate Classes.

235.    Ms. Bellamy, Ms. Carter, and Ms. White seek class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(2) related to Claims One, Two, Four and Five, for which prospective injunctive and declaratory relief is sought.  This Class is defined as: "All individuals whose driver's licenses are suspended, or will be suspended, by the South Carolina Department of Motor Vehicles due to their failure to pay fines, fees, surcharges, assessments, or court costs assessed for a traffic offense."  This Class is referred to as the "Suspension Class."

236.    Ms. Bellamy, Ms. Carter, and Ms. White also seek class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(2) related to Claim Three, for which prospective injunctive and declaratory relief is sought.  This class is defined as "All individuals whose driver's licenses are suspended, or will be suspended, by the South Carolina Department of Motor Vehicles due to their failure to pay reinstatement fees."  This Class is referred to as the "Reinstatement Fee Class."

237.    This action is brought, and may be properly maintained, as a class action under Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

238.    As set forth below, this action also satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

239.    **Impracticability of Joinder due to Numerosity:** The Suspension Class and Reinstatement Fee Class are each sufficiently numerous such that joinder of all members is impracticable.

240.    In response to an open records request, the DMV reported that 192,263 people had a driver's license that was suspended for failure to pay a traffic ticket under Section 56-25-20 as of May 31, 2019.  Additionally, in response to a different public records request, the DMV reported that it suspended the driver's licenses of 54,077 people for failure to pay a traffic ticket under Section 56-25-20 during the one-year period between March 30, 2018 and March 30, 2019.  The Suspension Class thus had approximately 190,000 members in May 2019, and today likely has even more members due to the DMV's ongoing policy and practice of punishing people with indefinite suspension of their drivers' licenses for failure to pay traffic fines and fees.  Absent the requested injunction, the size of the Suspension Class will grow over time.

241.    In response to a public records request, the DMV reported that as of January 15, 2019, there were 39,546 people with a South Carolina driver's license suspended solely because of failure to pay DMV reinstatement fees, even after resolving the unpaid traffic tickets that originally led to an FTPTT suspension.  It is also reasonable to believe there are people who continue to have driver's licenses under suspension even after their time-limited suspensions for violations like operating an unlicensed vehicle have expired, because they owe the DMV a $100 reinstatement fee for each suspension that was otherwise resolved.  Absent the requested injunction, the DMV will continue to be prohibited from reinstating driver's licenses on the basis

of unpaid reinstatement fees pursuant to Section 56-1-390, regardless of a person's inability to pay these fees, causing the size of the Reinstatement Fee Class to grow over time.

242.    Joinder of members of the proposed Classes is also impracticable because many members are unaware that their rights under the U.S. Constitution have been violated or that they are entitled to seek redress in court.  Members of the proposed Classes are also spread out across the state of South Carolina, and they are typically indigent people who lack financial resources to retain an attorney to bring an independent action or to be joined in this action.

243.    In response to a public records request, the DMV reported data demonstrating that only 37.6% of the 95,023 people who had a driver's license under suspension for failure to pay a traffic ticket at some point between March 30, 2018 and March 30, 2019, were able to secure license reinstatement during that same year.

244.    Putative members of the Classes are thus facing or have experienced the indefinite suspension of their driver's licenses for failure to pay traffic tickets and reinstatement fees precisely because of their limited resources and inability to pay; thus, it is also reasonable to assume they would be unable to afford counsel to bring their own separate action against Defendants.

245.    **Commonality:** The relief sought is common to all members of the proposed Classes, and common questions of law and fact exist as to all members of the Classes.  All members of the Suspension Class are equally subject to the DMV's enforcement of Section 56-25-20, which involves the indefinite suspension of driver's licenses for failure to pay traffic tickets without any pre-deprivation determination that the individual willfully failed to pay and without providing adequate notice of any hearing to determine ability to pay or opportunity to be heard on the issue of ability to pay.  All members of the Suspension Class are also equally

subject to the OMVH's policy and practice of denying hearings to people who cannot pay the $200 filing fee but seek to contest driver's license suspensions under Section 56-25-20 on the basis of inability to pay.  Additionally members of the Reinstatement Fee Class are equally subject to Section 56-1-390, which requires payment in full of a $100 reinstatement fee for each driver's license suspension on a driver's record in order for the DMV to lift the suspension when all other requirements for reinstatement have been met.

246.     Accordingly, Plaintiffs raise claims based on questions of law and fact that are common to, and typical of, the putative members of the Classes they seek to represent.  Common questions of fact include:

a.   Whether the DMV has a policy and practice of indefinitely suspending driver's licenses for failure to pay a traffic ticket under S.C. Code § 56-25-20 without requiring a pre-deprivation hearing;

b.   Whether the DMV has a policy and practice of indefinitely suspending driver's licenses for failure to pay a traffic ticket under S.C. Code § 56-25-20 without requiring a pre-deprivation inquiry into the individual's ability to pay and determination that nonpayment was willful;

c.   Whether Section 56-1-390 and the DMV's enforcement of the statute prohibit driver's license reinstatement without payment in full of reinstatement fees related to suspensions on the individual's record, without consideration of ability to pay or a determination that nonpayment is willful;

d.   Whether the OMVH has a policy and practice of refusing to reduce or waive the administrative filing fee set forth in S.C. Code § 56-5-2952 for people who cannot afford to pay so they may secure an administrative process to contest

the DMV's indefinite suspension of a driver's license for failure to pay a

traffic ticket;

e. Whether the suspension notice provided by the DMV to people whose driver's

licenses will be indefinitely suspended for failure to pay a traffic ticket under

Section 56-25-20 fails to inform them: (1) that they are entitled to a hearing

before the suspension becomes effective; (2) the date, time, and location of the

hearing; and (3) that a critical issue at that hearing will be their ability to pay

the traffic fines and fees they are alleged to have failed to pay.

Common questions of law include:

a. Whether the DMV's enforcement of S.C. Code § 56-25-20 violates rights

protected by the Due Process and Equal Protection Clauses of the Fourteenth

Amendment as delineated in *Bearden v. Georgia*, 461 U.S. 660 (1983), by

indefinitely suspending driver's licenses for failure to pay traffic tickets

without any pre-deprivation hearing on the individual's ability to pay and a

determination that nonpayment was willful;

b. Whether the DMV's enforcement of S.C. Code § 56-25-20 violates the Due

Process Clause of the Fourteenth Amendment by indefinitely suspending

drivers' licenses for failure to pay traffic tickets without any pre-deprivation

hearing on the individual's ability to pay;

c. Whether the DMV's enforcement of S.C. Code § 56-25-20 violates the Due

Process Clause of the Fourteenth Amendment by indefinitely suspending

driver's licenses for failure to pay traffic tickets without providing adequate

advance notice of procedures to prevent or contest the suspension on the basis

of inability to pay;

d.   Whether Section 56-1-390 and the DMV's enforcement of the statute violates

the Due Process and Equal Protection Clauses of the Fourteenth Amendment

as delineated in *Bearden*, 461 U.S. 660, by mandating the continued indefinite

suspension of driver's licenses based on failure to pay reinstatement fees

without requiring a hearing or any other inquiry into ability to pay and a

determination that nonpayment was willful;

e.   Whether the OMVH's enforcement of S.C. Code § 56-5-2952 violates the

Due Process and Equal Protection Clauses of the Fourteenth Amendment as

delineated in *Bearden*, 461 U.S. 660, by failing to provide a mechanism for

waiver, based on inability to pay, of the filing fee for a hearing to contest a

driver's license suspension.

247.   **Typicality:** Plaintiffs Bellamy, Carter, and White seek the same declaratory and

injunctive relief under the same legal theories that all members of the proposed Suspension Class

and Reinstatement Fee Class seek.

248.   The claims of Ms. Bellamy, Ms. Carter, and Ms. White are typical of the claims

of the proposed Suspension Class because all claims arise from the same common policies and

practices of Defendants.   Ms. Bellamy, Ms. Carter, and Ms. White and the putative Suspension

Class members have suffered or will suffer the same direct, irreparable injury of the indefinite

loss of their driver's licenses for FTPTT.   This injury will continue unless the DMV's

enforcement of Section 56-25-20 is declared unconstitutional and the agency is enjoined from

suspending licenses pursuant to that statute, absent the provision of meaningful pre-deprivation

notice and opportunity to be heard, and the determination that nonpayment is willful.

249.    Further, Ms. Bellamy, Ms. Carter, and Ms. White, and the putative Suspension

Class members have suffered, or will suffer, the same direct and irreparable injury of the

indefinite loss of their driver's licenses without access to an administrative appeal despite their

inability to pay.  This injury will continue unless the OMVH's enforcement of Section 56-5-2952

is declared unconstitutional, and the OMVH is enjoined from denying hearings to people seeking

to contest driver's license suspensions for FTPTT due to nonpayment of the filing fee.

250.    Because Ms. Bellamy, Ms. Carter, and Ms. White, and the proposed Suspension

Class challenge the same enforcement of statutes by the DMV and the OMVH, Defendants will

likely assert similar defenses against the named Plaintiffs and proposed Suspension Class

members.  Moreover, the answer to whether the DMV's enforcement of Section 56-25-20 and

the OMVH's enforcement of Section 56-5-2952 are unconstitutional will determine the success

of the claims of the named Plaintiffs and every other proposed Suspension Class member.  If

named Plaintiffs succeed on the claim that the DMV's enforcement of Section 56-25-20 and

Defendant Anderson's and the OMVH's enforcement of Section 56-5-2952 violate their

constitutional rights, that ruling will likewise benefit every other member of the proposed

Suspension Class.

251.    The claims of Ms. Bellamy, Ms. Carter, and Ms. White are typical of the

Reinstatement Fee Class as a whole.  Ms. Bellamy, Ms. Carter, and Ms. White, and the putative

Reinstatement Fee Class members have suffered, or will suffer, the same direct, irreparable

injury of the indefinite loss of their driver's licenses based on outstanding reinstatement fees,

without any assessment of the willfulness of nonpayment or hearing at which to contest the

continued suspension on the basis of inability to pay. This injury will continue unless Section 56-1-390 is declared unconstitutional and the DMV is enjoined from maintaining driver's license suspensions pursuant to that statute.

252. Because Ms. Bellamy, Ms. Carter, Ms. White, and the proposed Reinstatement Fee Class challenge Section 56-1-390 on its face, Defendants will likely assert similar defenses against Ms. Bellamy, Ms. Carter, Ms. White, and the proposed Reinstatement Fee Class members. Moreover, the answer to whether Section 56-1-390 is unconstitutional will determine the success of the claims of Ms. Bellamy, Ms. Carter, Ms. White, and every other proposed Reinstatement Fee Class member. If Ms. Bellamy, Ms. Carter, and Ms. White succeed on the claim that Section 56-1-390 is unconstitutional, that ruling will likewise benefit every other member of the proposed Reinstatement Fee Class.

253. **Adequacy:** Ms. Bellamy, Ms. Carter, and Ms. White have a strong personal interest in the outcome of this action, have no conflicts of interest with other members of the proposed Classes, seek only the same declaratory and injunctive relief on behalf of themselves and all members of the proposed Classes, and will fairly and adequately represent and protect the interests of the proposed Classes.

254. **Rule 23(b)(2):** Class action status under Rule 23(b)(2) is appropriate because the DMV and the OMVH are acting or failing/refusing to act on grounds that generally apply to the proposed Classes, such that preliminary and final injunctive and declaratory relief is appropriate and necessary with respect to each member of each Class. Specifically, pursuant to Section 56-25-20, the DMV maintains a policy and practice of systematically and indefinitely suspending drivers' licenses for failure to pay traffic tickets in an unconstitutional manner—without any pre-

deprivation hearing on the issue of ability to pay, adequate notice, and determination of willful failure to pay—that is generally applicable to the proposed Suspension Class.

255.    Additionally, the OMVH is enforcing Section 56-5-2952 to maintain an unconstitutional policy and practice of denying administrative hearings to challenge the suspension of driver's licenses for failure to pay traffic tickets under Section 56-25-20 on the basis of nonpayment of the $200 filing fee for securing an OMVH hearing.  This policy and practice is generally applicable to the proposed Suspension Class.

256.    Finally, Section 56-1-390 applies on its face to any person who owes a DMV reinstatement fee, and therefore requires the DMV to continue the indefinite suspension of the driver's licenses of all members of the proposed Reinstatement Fee Class without holding an ability-to-pay hearing and determining that nonpayment of these fees is willful.  Accordingly, Plaintiffs seek on behalf of themselves and the members of both proposed Classes: (a) a declaration that the DMV's enforcement of Section 56-25-20 to indefinitely suspend drivers' licenses for failure to pay traffic tickets without pre-deprivation notice, ability-to-pay hearings, and determination that failure to pay is willful, violates the Fourteenth Amendment; (b) an injunction that prohibits the DMV from suspending driver's licenses for failure to pay traffic tickets under Section 56-25-20 without affording meaningful pre-deprivation notice and an opportunity to be heard and without making a pre-deprivation determination of willful nonpayment; (c) an injunction that requires the DMV to lift all current FTPTT suspensions on driver's licenses under Section 56-25-20, to strike all reinstatement fees related to FTPTT suspensions, to reinstate driver's licenses that are subject to no other basis for suspension, and to provide notices to license holders of these changes; (d) a declaration that Section 56-1-390 is unconstitutional because it prohibits reinstatement of a driver's license until all reinstatement

fees are paid in full, without requiring a hearing or other consideration of a driver's ability to pay and a determination of willful nonpayment; (e) a declaration that the OMVH's enforcement of Section 56-5-2952 to require that people pay a non-waivable $200 filing fee in order to secure an administrative process by which to contest the DMV's suspension of a driver's license violates the Fourteenth Amendment; (f) an injunction striking Section 56-1-390, requiring the DMV to cease holding driver's licenses under indefinite suspension based solely on outstanding reinstatement fees, and requiring the DMV to reinstate any driver's licenses that have no other basis for suspension; (g) an injunction that prohibits the OMVH from requiring the payment of a filing fee from those who cannot pay before providing a hearing concerning the DMV's suspension of a driver's license for failure to pay traffic tickets; and (h) an injunction that requires Defendant Anderson to amend OMVH Rule 21 to permit waiver and reduction of the $200 filing fee set forth in Section 56-5-2952, and to amend OMVH Rules 21, 4(A), 4(C), and 9(A) to permit the assignment of cases contesting the DMV's suspension of driver's licenses to hearing officers absent payment of any filing fee.  These requested forms of relief would benefit every member of the proposed Classes.

257.     **Rule 23(g):** The named Plaintiffs are represented by the American Civil Liberties Union Foundation ("ACLU"), the American Civil Liberties Union Foundation of South Carolina ("ACLU-SC"), Terrell Marshall Law Group PLLC ("Terrell Marshall"), the Southern Poverty Law Center ("SPLC"), and South Carolina Appleseed Legal Justice Center ("SC Appleseed"). All counsel are experienced attorneys who have litigated a range of complex lawsuits and have knowledge of the relevant constitutional and statutory law.

258.     Plaintiffs' counsel also have extensive knowledge of the widespread constitutional violations occurring throughout South Carolina and outlined in this Complaint

based on more than one year of investigation involving court observations, reviews of public records, and numerous interviews with South Carolina driver's license holders and witnesses.

259.    Plaintiffs' counsel at the ACLU, ACLU-SC, SPLC, and Terrell Marshall have served as counsel in similar federal lawsuits bringing constitutional challenges to policies and practices concerning wealth-based driver's license suspension and the collection of court fines and fees in violation of the rights to due process, equal protection, and counsel. *See Brown v. Lexington County*, No. 3:17-cv-01426-MBS-SVH (D.S.C. June 1, 2017) (ACLU as lead, with ACLU-SC and Terrell Marshall); *Johnson v. Jessup*, No. 1:18-cv-00467 (M.D.N.C. May 30, 2018) (SPLC lead with ACLU); *Kennedy v. Biloxi*, No. 1:15-cv-348-HSO-JCG (S.D. Miss. Oct. 21, 2015) (ACLU lead); and *Thompson v. DeKalb Cty.*, No. 1:15-cv-280 (N.D. Ga. Jan. 29, 2015) (ACLU lead). Plaintiffs' counsel at Terrell Marshall served as lead counsel, with the ACLU as co-counsel, in a state lawsuit bringing constitutional claims against the collection of court fines and fees in violation of rights to due process and equal protection. *See Fuentes v. Benton Cty.*, No. 15-2-02976-1 (Wash. Super. Ct., Yakima Cty. Oct. 6, 2015).

260.    Plaintiffs' counsel at SC Appleseed have significant experience in complex civil litigation, including class action litigation in federal and state courts. SC Appleseed is currently serving as co-counsel in a class action lawsuit in federal court seeking systemic reform of South Carolina's child welfare system, *Michelle H. v. McMaster*, No. 2:15-cv-00134-RMG (D.S.C. Jan. 12, 2015), and in a class action lawsuit in state court challenging the denial of unemployment benefits to tens of thousands of South Carolinians, *Patterson v. S.C. Dep't of Employment and Workforce*, No. 2013-CP-06-00059 (S.C. Ct. of C.P., Barnwell Cty., Feb. 14, 2013).

261.    Plaintiffs' counsel also have the resources, expertise, and experience to prosecute this action.  Plaintiffs' counsel know of no conflicts among members of the Classes or between the attorneys and members of the Classes.

## CLAIMS FOR RELIEF

## CLAIM ONE
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Indefinite Suspension of Driver's Licenses for Failure to Pay
Traffic Fines and Fees Without Pre-Deprivation Hearing on Ability
to Pay and Determination of Willful Failure to Pay
(in violation of the Due Process and Equal Protection Clauses of
the Fourteenth Amendment to the U.S. Constitution, as delineated
in *Bearden v. Georgia*, 461 U.S. 660 (1983), and 42 U.S.C. §
1983, by all Plaintiffs and the proposed Suspension Class against
Defendant Shwedo).

262.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

263.    Plaintiffs Bellamy, Carter, and White bring this claim on behalf of themselves and the members of the proposed Suspension Class.

264.    The Fourteenth Amendment's Due Process and Equal Protection Clauses prohibit states from "punishing a person for [their] poverty" by imposing sanctions solely due to the person's inability to pay court fines and fees.  *See Bearden v. Georgia*, 461 U.S. 660, 671 (1983).  Before imposing a sanction for failure to pay traffic fines or fees, the state must first provide a hearing, consider the individual's ability to pay, and determine that the person willfully refused to pay.

265.    The DMV exercises its authority under Section 56-25-20 to implement a policy and practice of indefinitely suspending driver's licenses for failure to pay traffic fines and fees without considering ability to pay, ensuring that nonpayment is willful, and determining whether

there are adequate measures besides automatic, indefinite driver's license suspension to accomplish the state's goals.  Rather than being based on willful nonpayment, the DMV's indefinite driver's license suspensions under Section 56-25-20 are based exclusively on a report of an individual's failure to pay fines or fees assessed for a traffic violation.

266.    In his official capacity, Defendant Shwedo is the final decisionmaker as to the DMV's suspension of driver's licenses for failure to pay traffic tickets under Section 56-25-20 and establishment of policy and practice concerning the indefinite suspension of driver's licenses pursuant to the statute.  Defendant Shwedo is therefore responsible for ongoing violations of the rights to due process and equal protection under the law of Plaintiffs Carter, Bellamy, White and members of the proposed Suspension Class.

267.    Plaintiffs have a substantial interest in their driver's licenses.  A driver's license is a recognized and substantial property interest that is "essential in the pursuit of a livelihood."[69] Stripping people of their interest in a driver's license commonly leads to economic hardship in South Carolina, where the vast majority of people need a driver's license to find and keep paid employment.

268.    The DMV's policy and practice of indefinitely suspending licenses for failure to pay traffic fines and fees under Section 56-25-20 without providing a pre-deprivation hearing or consideration of an individual's ability to pay has an extensive and substantial impact on an individual's interest in their driver's license.  Under Section 56-25-20, the DMV does not lift an FTPTT suspension until all traffic fines and fees and reinstatement fees—$100 for each suspension—are paid in full.  People who are unable to pay traffic fines and fees and reinstatement fees in full suffer a severe and potentially limitless disadvantage in earning

---

[69] *Bell v. Burson*, 402 U.S. 535, 539 (1971).

resources that has no clear end date as well as devastating limitations on their ability to care for themselves and their families, to participate in civic life, and to even pay off their fines and fees to the court.

269.    Ms. Bellamy and Ms. Carter are unable to pay and have no way to secure reinstatement of their driver's licenses under the DMV's enforcement of Section 56-25-20.  Ms. Bellamy continues to live in poverty because she cannot pursue additional, higher-paid part-time work in housecleaning with her former employer because she cannot legally drive between work sites.  Ms. Carter continues to experience financial hardship because she cannot accept a higher paying position as a reentry caseworker due to her inability to legally drive to meet clients at their homes, as required for the job.  Additionally, without a driver's license, Ms. Bellamy is unable to visit and help her mother, who lives with HIV, and faces challenges in securing transportation to ensure her children's health care and her own participation in a group that provides support for families.  Ms. Bellamy and her children are also unable to visit their extended family and to participate in community and extracurricular activities because Ms. Bellamy lacks a valid driver's license.  Ms. Carter has reduced her church attendance because the indefinite suspensions on her driver's license erects barriers to getting to and from church, impeding her ability to worship.

270.    Ms. White faces a substantial risk that she will imminently experience the indefinite suspension of her driver's license for failure to pay traffic tickets she cannot afford due to the DMV's enforcement of Section 56-25-20.  Ms. White currently faces three traffic tickets for which the penalty is up to $1,942 in fines and additional fees.  If she is found guilty, she may be sentenced to pay more than $2,000, which she cannot afford.  If her license is again suspended for FTPTT, as it previously was when she could not pay a traffic ticket, Ms. White will again be

forced to choose between not driving to work and risking her family's well-being, or driving and risking further criminalization for not having a valid driver's license.

271.    The DMV's policy and practice of indefinitely suspending driver's licenses for nonpayment of traffic fines and fees without determining ability to pay is not rationally related to any legitimate government purpose.

272.    While South Carolina does have a legitimate interest in encouraging compliance with the law and collecting fines and fees imposed for violating traffic offenses, punishing a person who cannot pay through no fault of their own does not make payment more likely.  In fact, doing so is counterproductive to the state's interest in collecting money, as many people will become even less able to pay following driver's license suspension because they will lose their jobs or be unable to find paid employment due to the suspension itself.  This in turn may lead to more traffic law violations for driving under suspension due to the impossible choice confronted by people with suspended licenses: refrain from driving and potentially lose jobs and the ability to care for themselves and their families or drive and risk criminal penalties for driving on a suspended license.

273.    The DMV's indefinite suspension of driver's licenses for failure to pay under Section 56-25-20 also does not promote public safety goals.  There are numerous other South Carolina statutes that enable the DMV to suspend driver's licenses for legitimate safety reasons, such as driving under the influence.[70]

274.    There are ample alternative means for the DMV to effectuate its purpose of collecting traffic fines.  The DMV could extend people more time to pay, require the payment of only those traffic fines and fees people can afford, waive DMV reinstatement fees for those

---

[70] *See, e.g.*, S.C. Code Ann. § 56-5-2990 (permitting license suspensions for driving under the influence, first offense).

unable to pay, utilize graduated payment plans to collect, or order people to complete reasonable community service or coursework.

275.    All people whose driver's licenses were indefinitely suspended by the DMV for failure to pay traffic fines and fees are similarly situated with respect to their right to due process and equal protection under the Fourteenth Amendment.  There exists no legitimate governmental reason to indefinitely suspend the driver's licenses of people who are unable to pay the full amount of outstanding monetary penalties for traffic violations, while permitting people who have the financial means to pay fines and fees to avoid driver's license suspensions for the same traffic violations.

**CLAIM TWO**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

Failure to Provide Pre-Deprivation Hearings Concerning Indefinite
Driver's License Suspension for Failure to Pay Traffic Fines and
Fees Without Payment of $200 Filing Fee
(in violation of the Due Process and Equal Protection Clauses of
the Fourteenth Amendment to the U.S. Constitution, as delineated
in *Bearden v. Georgia*, 461 U.S. 660 (1983), and
42 U.S.C. § 1983, by all Plaintiffs and the proposed
Suspension Class against Defendant Anderson).

276.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

277.    Plaintiffs Bellamy, Carter, and White bring this claim on behalf of themselves and the members of the proposed Suspension Class.

278.    The Fourteenth Amendment's Due Process and Equal Protection Clauses prohibit states from "punishing a person for [their] poverty" by imposing sanctions solely due to the person's inability to pay court fines and fees.  *See Bearden v. Georgia*, 461 U.S. 660, 671 (1983).  Wealth-based discrimination violates the Fourteenth Amendment when the state imposes

financial barriers to accessing appellate proceedings.  *See Griffin v. Illinois*, 351 U.S. 12, 18 (1956).

279.    The only mechanism that a person who is unable to pay could theoretically use to challenge the DMV's indefinite suspension of a driver's license for failure to pay a traffic ticket is a contested case hearing before the OMVH.[71]  But the OMVH erects wealth-based barriers to accessing this redress process.

280.    Ms. Carter and Ms. White submitted written requests to the OMVH for hearings to contest the DMV's continued suspension of their driver's licenses under Section 56-25-20 despite their inability to pay the traffic fines and fees that were the basis of the suspensions.  Ms. Carter and Ms. White also submitted requests for a waiver of the $200 filing fee along with financial statements demonstrating their inability to pay the filing fee.  The OMVH denied Ms. Carter and Ms. White's requests for a hearing on the basis that they failed to pay the $200 filing fee for each contested driver's license suspension, as required by the OMVH Rules and Section 56-5-2952.

281.    Section 56-5-2952 provides that the filing fee for an OMVH hearing is $200 "or as otherwise prescribed by the rules of procedure for the [OMVH]."  OMVH Rule 21, in turn, provides: "Each request for a contested case hearing before the Office must be accompanied by a filing fee in the amount established by law.  A case will not be assigned to a hearing officer until the filing fee has been paid."[72]  OMVH Rules 4(A), 4(C), and 9(A) further reference the requirement that the filing fee must be paid in full for a contested case to be assigned to an OMVH hearing officer.[73]

---

[71] *See* S.C. Code Ann. § 56-1-370.
[72] OMVH R. 21 (emphasis supplied).
[73] OMVH R. 4(A), 4(C), & 9(A).

282.    OMVH Rules 21, 4, and 9 thus require people seeking to prevent or contest a driver's license suspension to pay in full a non-waivable $200 filing fee for each disputed license suspension before the case is assigned to a hearing officer.[74]  In practice, the OMVH rejects requests to waive the filing fee, even when supported by documentation of inability to pay the fee, and requires a separate $200 filing fee for each disputed suspension on a driver's license. Thus, due to their inability to pay filing fees that can total hundreds, if not thousands, of dollars, people who seek a hearing to explain to the OMVH that their driver's license should not be suspended under Section 56-25-20 due to inability to pay a traffic ticket cannot even access a hearing to make that argument.

283.    Defendant Anderson enforces an OMVH policy and practice of categorically denying requests for waiver of the $200 filing fee and refusing to assign cases to hearing officers until the filing fee is paid in full, as set forth in OMVH Rules 21, 4, and 9.

284.    Defendant Anderson's enforcement of a policy and practice of requiring full payment of a $200 filing fee before assigning a case to an OMVH hearing officer impacts the substantial interest of the members of the proposed Suspension Class in their driver's licenses by preventing people who are unable to pay the filing fee from pursing administrative appellate review that could afford them relief from indefinite license suspension.  As a result, people who seek to prevent or contest FTPTT suspensions on the basis of inability to pay, but cannot pay OMVH filing fees, suffer from indefinite license suspension, and the resulting severe and potentially limitless disadvantages in earning resources and devastating limitations on their ability to care for themselves and their families and to participate in civic life.

---

[74] *See* OMVH R. 21.

285.    Defendant Anderson's policy and practice of requiring payment of a filing fee to secure administrative appellate review of a DMV suspension thus absolutely deprives people of a critically important benefit—the ability to access justice to prevent or terminate a wrongful deprivation of the property interest in a driver's license.

286.    Deprived from the opportunity to argue their case, indigent people are trapped in a cycle of driver's license suspension, job loss, and poverty that increases the likelihood that they will suffer additional economic hardship and will never be able to repay the traffic debt that led to the suspension of their licenses in the first place.

287.    The OMVH's policy and practice of depriving people who cannot afford to pay filing fees from accessing the sole possible avenue for redress from an indefinite failure-to-pay license suspension does not reasonably further any legitimate government purpose.

288.    OMVH filing fees are used to fund OMVH operations.  While the government does have a legitimate interest in raising revenue to fund OMVH operations, depriving people who cannot pay from the only conceivable process for seeking redress from driver's license suspensions based on inability to pay fines and fees does not further this interest.

289.    There are ample alternative means to effectuate South Carolina's interest in generating revenue to pay for the cost of operating the OMVH.  Defendant Anderson could seek additional funding from the South Carolina legislature to fund the OMVH or could divert resources from another ALC division to permit filing fee reduction or waiver for people who are unable to pay.   Moreover, all South Carolina administrative law courts, with the exception of the OMVH, have adopted fee waivers, demonstrating that the OMVH could implement a similar policy and practice of waiving filing fees for people who cannot afford to pay.[75]

---

[75] *See* S.C. Code Ann. § 1-23-670.

## CLAIM THREE
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Indefinite Suspension of Driver's Licenses for Failure to Pay
Reinstatement Fees under S.C. Code Ann. § 56-1-390 Without Pre-
Deprivation Hearing on Ability to Pay and
Determination of Willful Failure to Pay
(in violation of the Due Process and Equal Protection Clauses of
the Fourteenth Amendment to the U.S. Constitution, as delineated
in *Bearden v. Georgia*, 461 U.S. 660 (1983), and
42 U.S.C. § 1983, by all Plaintiffs and the proposed
Reinstatement Fee Class against Defendant Shwedo).

290.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

291.    Plaintiffs Bellamy, Carter, and White bring this claim on behalf of themselves and the members of the proposed Reinstatement Fee Class.

292.    The Fourteenth Amendment's Due Process and Equal Protection Clauses prohibit states from "punishing a person for [their] poverty" by imposing sanctions solely due to the person's inability to pay fines and fees. *See Bearden v. Georgia*, 461 U.S. 660, 671 (1983). Refusing to lift a driver's license suspension based solely on nonpayment of reinstatement fees without considering one's ability to pay punishes those without financial means to pay reinstatement fees. Before imposing a sanction for failure to pay reinstatement fees, the state must consider an individual's ability to pay and determine that the person willfully refused to pay.

293.    In his official capacity, Defendant Shwedo is the executive and administrative head of the Department of Motor Vehicles.[76]  In this capacity, he is responsible for the DMV's compliance with, and enforcement of, Section 56-1-390.  Defendant Shwedo is therefore

---

[76] *See* S.C. Admin. Law Ct. R. 71(B).

responsible for ongoing violations of the rights to due process and equal protection under the law of Plaintiffs and members of the proposed Classes.

294.    The plain text of Section 56-1-390 prohibits the DMV from reinstating or renewing a person's driver's license until "[they] remit[] to the department a reinstatement fee of one hundred dollars for each suspension on [their] driving record that has not been reinstated." Under the plain terms of Section 56-1-390, the DMV is prohibited from permanently reinstating driver's licenses until all reinstatement fees are paid in full—even when other bases for suspension are resolved—and is not required to consider ability to pay, hold a hearing, or determine that nonpayment is willful.

295.    Plaintiffs Bellamy, Carter, and White have a substantial interest in their driver's licenses.  They have relied on their ability to drive lawfully to find and keep employment, care for their children, participate in civic and religious activities, be with their families, and obtain medical treatment.  Section 56-1-390 condemns Ms. Bellamy and Ms. Carter to driver's license suspension because they cannot afford to pay reinstatement fees.  Ms. Carter owes at least $500 in DMV reinstatement fees.  Ms. Bellamy owes at least $1,305 in DMV reinstatement fees. Neither can afford to pay these reinstatement fees.  Section 56-1-390 similarly will condemn Ms. White to driver's license suspension because once her license is suspended for unpaid traffic fines, Ms. White will not be able to afford the reinstatement fees charged for each FTPTT suspension.  Even if Ms. Bellamy and Ms. Carter were able to resolve the traffic tickets that led to the FTPTT suspensions on their driver's licenses—and similarly, even if Ms. White is able to resolve the traffic tickets recently incurred that place her at substantial risk of driver's license suspension and the imposition of reinstatement fees—Section 56-1-390 prohibits the DMV from

reinstating their driver's licenses until these reinstatement fees are paid in full, despite their inability to pay.

296.    Without valid driver's licenses, Ms. Bellamy, Ms. Carter, and Ms. White will suffer significant hardship.  Ms. Bellamy will continue to live in poverty because, without a valid driver's license, she cannot pursue higher-paid, part-time work in housekeeping and home health care to supplement her income as a children's daycare worker.  Additionally, because her employer can no longer assist with her morning commute, Ms. Bellamy also faces hurdles, without a valid driver's license, to securing the transportation needed to take her daughter to school and to take herself and her three younger children to the daycare where she works.  Ms. Bellamy will also continue to be unable to visit and care for her ill mother, and face barriers to ensuring her children's medical care and her own ability to participate in a support group for families.  Additionally, she and her children will remain unable to be with their extended family and to participate in community and extracurricular activities because Ms. Bellamy lacks the valid driver's license needed to reliably get to and from these locations.  Ms. Carter will continue to struggle financially because she cannot accept a higher-paying job that requires a valid driver's license.  Ms. White will continue to struggle with financial instability and debt if her driver's license is again suspended for failure to pay traffic tickets.  Ms. White will also be unable to take her daughter to and from school, to get to and from work, and to engage in other travel necessary for her to care for her family unless she risks additional fines and jail time by driving on a suspended license.

297.    Section 56-1-390 is not rationally related to any legitimate government purpose.

298.    While South Carolina has a legitimate interest in raising revenue for the DMV and South Carolina Department of Transportation through reinstatement fees, punishing a person

who cannot pay by continuing to suspend their driver's license until these fees are paid does not reasonably further any legitimate government purpose. The DMV's enforcement of Section 56-1-390 is counterproductive to the state's interest in collecting money, as many people will become even less able to pay due to the continued, indefinite suspension of their driver's licenses. Many people who cannot afford to pay reinstatement fees will either lose their jobs or be unable to find paid employment due to the continued suspension of their driver's licenses under Section 56-1-390. Others will perhaps make the difficult decision to continue driving under suspension and risk additional tickets, fines, and potentially even jail time. There is no rational basis for this continued suspension.

299.    There are ample means other than indefinite driver's license suspension for failure to pay reinstatement fees to effectuate South Carolina's interest in recouping the administrative costs of reinstating driver's licenses. The DMV could create a reinstatement fee payment plan that is accessible to all drivers, use civil debt collection procedures to recoup unpaid reinstatement fees, seek public funding to cover these costs, or simply reserve indefinite driver's license suspension only for those who have willfully failed to pay reinstatement fees.

300.    All people who owe DMV reinstatement fees are similarly situated with respect to their right to due process and equal protection under the Fourteenth Amendment. There exists no legitimate governmental reason to indefinitely suspend the driver's licenses of people who are unable to pay the full amount of outstanding reinstatement fees for traffic violations, while permitting people who have the financial means to pay reinstate their driver's licenses.

**CLAIM FOUR**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

Indefinite Suspension of Driver's Licenses for Failure to Pay Traffic Fines and Fees
Without Pre-Deprivation Ability-To-Pay Hearing
(in violation of the Due Process Clause of the Fourteenth
Amendment to the U.S. Constitution and 42 U.S.C. § 1983,
by all Plaintiffs and the proposed Suspension Class against
Defendants Shwedo and Anderson).

301.    Plaintiffs re-allege and incorporate by reference each and every allegation
contained in the preceding paragraphs as if fully set forth here.

302.    Plaintiffs Bellamy, Carter, and White bring this claim on behalf of themselves and
the members of the proposed Suspension Class.

303.    The Fourteenth Amendment of the U.S. Constitution prohibits the State of South
Carolina from depriving any person of life, liberty, or property without due process of law.

304.    The central meaning of procedural due process when a property interest is at stake
is notice and a meaningful opportunity to be heard in a meaningful time and in a meaningful
manner.  *See Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).

305.    The right to prior notice and a prior hearing is central to the Constitution's
command of due process.[77]

306.    Pre-deprivation notice and a hearing on the willfulness of nonpayment before a
driver's license is suspended for failure to pay traffic fines and fees is constitutionally required
because license suspension under Section 56-25-20 imposes a substantial, indefinite hardship and
because reinstatement is only accessible upon payment of all traffic fines and fees and
reinstatement fees, which is impossible for a person who is unable to pay.[78]

---

[77] *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993).

[78] *See Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 529-31 (W.D. Va. Dec. 21, 2018) (same with
respect to Virginia statute); *Thomas v. Haslam*, 329 F. Supp. 3d 475, 495 (M.D. Tenn. 2018),

307.    Neither the South Carolina Code, including Section 56-25-20, the DMV, nor the OMVH, mandates a hearing before indefinitely suspending a driver's license for failure to pay traffic fines and fees.

308.    Neither the South Carolina Code, including Section 56-25-20, the DMV, nor the OMVH, mandates an inquiry into whether nonpayment was willful before indefinitely suspending a license for failure to pay traffic fines and fees.

309.    The DMV's policy and practice of suspending driver's licenses for FTPTT under Section 56-25-20 demonstrates that the goal of the agency's enforcement of the statute is to collect fines and fees for traffic violations owed to South Carolina summary courts and to courts in states that participate in the Non-Resident Violator Compact.  Although Section 56-25-20 grants the DMV discretion to suspend driver's licenses for noncompliance with traffic citations or littering summons, in practice, the DMV elects only to indefinitely suspend a driver's license under the statue if the individual fails to pay the fines and fees assessed for a traffic violation before the suspension goes into effect.

310.    Whether an individual is able to pay is relevant to the statutory scheme in South Carolina concerning punishment for nonpayment of traffic fines and fees.  For example, Section 17-25-350 provides that "[n]o person found to be indigent shall be imprisoned because of inability to pay the fine in full at the time of conviction," and that any fine imposed on an indigent defendant must be payable through a reasonable payment plan.  Additionally, *Bearden v. Georgia*, 461 U.S. 660 (1983), requires consideration of ability to pay and a determination that an individual is able to pay, but willfully failed to do so, before the person may be punished for nonpayment.

_____

*vacated as moot*, *Thomas v. Lee*, No. 18-5766, 2019 WL 4316795 (6th Cir. Sept. 12, 2019) (same with respect to Tennessee statute).

311.    Plaintiffs and members of the proposed Suspension Class have a substantial interest in their driver's licenses.  The indefinite suspension of Plaintiffs driver's licenses for FTPTT under Section 56-25-20 has caused them to suffer from severe and potentially limitless disadvantages in earning resources and devastating limitations on their ability to care for themselves and their families and to participate in civic life.

312.    The DMV's enforcement of Section 56-25-20 creates a substantial risk of erroneously suspending the driver's licenses of those who are unable to pay because no pre-deprivation hearing on ability to pay is mandated or enforced.  To the contrary, the DMV consistently exercises its discretion to indefinitely suspend driver's licenses under Section 56-25-20 upon notice of failure to pay without any hearing or ability-to-pay inquiry.  Thus, it is impossible for the DMV to accurately identify people whose licenses should be suspended because they are able to pay, but willfully fail to do so, as opposed to those whose licenses should not be suspended because they are unable to pay, and will remain unable to pay, even if their license is suspended.

313.    Additionally, Defendant Anderson and the OMVH's enforcement of Section 56-5-2952 creates a substantial risk of sustaining the erroneous suspension of the driver's licenses of those who are unable to pay because it denies an administrative hearing concerning the DMV's suspension to anyone who cannot pay the required filing fee.

314.    A pre-suspension hearing will reduce the risks of erroneous deprivation by permitting an inquiry into ability to pay and whether nonpayment was willful.

315.    A pre-suspension hearing to determine willful nonpayment would not impose substantial fiscal and administrative burdens on the State.

316.     To the extent that a pre-suspension hearing would impose some fiscal or administrative burdens on the State, these burdens are outweighed by the driver's substantial interest in maintaining a license and the need to ensure that erroneous suspensions do not occur.

317.     There exist no extraordinary circumstances, important governmental or general public interests—including public safety—that justify the absence of an ability-to-pay hearing and willfulness determination before the indefinite suspension of driver's licenses for nonpayment.  Indeed, there is no connection between failure to pay and a driver's ability to safely operate a vehicle.

318.     Rather, the State's primary interest at stake here is the collection of traffic fines and fees and reinstatement fees charged by the DMV.  The State's financial interest in the collection of fines and fees is not advanced by suspending the driver's licenses of those who cannot afford to pay, and thus is not advanced without ensuring pre-deprivation hearings.

319.     The suspension of Plaintiffs' driver's licenses for failure to pay traffic tickets and reinstatement fees without a pre-suspension hearing to evaluate their ability to pay and to determine willfulness violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

320.     Under Defendant Shwedo's direction, the DMV fails to provide any pre-deprivation ability-to-pay hearings to people reported to the agency for nonpayment of traffic tickets.  In his official capacity, Defendant Shwedo could adopt additional procedural safeguards but fails to do so.

321.     Under Defendant Anderson's direction, the OMVH denies ability-to-pay hearings due to nonpayment of the filing fee by people who seek to prevent or contest the suspension of a driver's licenses under Section 56-25-20.  In his official capacity, Defendant Anderson could

amend OMVH Rules 21, 4, and 9 so that payment of the $200 filing fee under Section 56-5-2952 is not required for a case challenging the DMV's suspension of a driver's license to be assigned to an OMVH hearing officer.  In his official capacity, Defendant Anderson could also assign hearing officers to contested cases concerning the suspension of driver's licenses even when filing fees are not paid.

**CLAIM FIVE**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

<u>Inadequate Pre-Deprivation Notice of Procedures to Prevent or Contest</u>
<u>Indefinite Suspension of Driver's Licenses for Failure to Pay Traffic Fines and Fees</u>
(in violation of the Due Process Clause of the Fourteenth
Amendment to the U.S. Constitution and 42 U.S.C. § 1983,
by all Plaintiffs and the proposed Suspension Class against
Defendant Shwedo).

322.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

323.     Plaintiffs Bellamy, Carter, and White bring this claim on behalf of themselves and the members of the Suspension Class.

324.     The Fourteenth Amendment to the U.S. Constitution prohibits the State of South Carolina from depriving any person of life, liberty, or property without due process of law.

325.     The central meaning of due process when a property interest is at stake is notice and a meaningful opportunity to be heard in a meaningful time and in a meaningful manner.  *See Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).

326.     Notice must be reasonably calculated, under all the circumstances to apprise interested parties of the pendency of the action; to accurately describe legal rights and options available to the parties; and to afford them a timely opportunity to present their objections.

327.    In circumstances where a punishment may be imposed, notice must adequately inform the party as to what the critical issue of the hearing will be.  *See Turner v. Rogers*, 564 U.S. 431, 447–48 (2011).

328.    The DMV fails to provide adequate notice before driver's licenses are suspended for failure to pay traffic fines and fees under Section 56-25-20, in violation of the Due Process Clause.  The Official Notice, which is the only DMV notice provided to people regarding a pending suspension for failure to pay traffic fines, does the following: (1) it impermissibly states that the only way to prevent a driver's license suspension for failure to pay a traffic ticket under Section 56-25-20 is by paying the fines and fees associated with a particular traffic ticket in full and by providing the DMV with proof that full payment was made before the license suspension start date; (2) it states that the only way to end the indefinite suspension of a driver's license for failure to pay traffic tickets under Section 56-25-20 is by paying the fines and fees associated with a particular ticket and by paying the additional required reinstatement fees to the DMV; (3) it fails to provide any notice about a right to a pre-deprivation hearing; (4) it fails to identify the redress process, if any, available to prevent or contest the suspension of a driver's license for failure to pay traffic tickets under Section 56-25-20; and (5) it fails to inform the individual that the willfulness of nonpayment will be a critical issue at any hearing.

329.    Plaintiffs did not receive written notice of their pending driver's license suspensions under Section 56-25-20 at a time that would have permitted them to follow applicable statutes and rules so as to file a timely written request for an OMVH hearing to attempt to prevent the suspensions of their driver's licenses for failure to pay traffic tickets.

330.    To the extent Plaintiffs received any written notice before the DMV's indefinite suspension of their driver's licenses under Section 56-25-20, none of the notices referenced how

to access a redress process before the effective date of suspension. Instead, the notices solely indicated that the only way to prevent or lift the suspension was to pay all traffic fines and fees and reinstatement fees in full.

331.    The indefinite driver's license suspensions of Plaintiffs and members of the proposed Suspension Class for failure to pay traffic tickets, without adequate notice, violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

332.    Under Defendant Shwedo's direction, the DMV fails to provide adequate pre-deprivation notice to people facing a pending, indefinite driver's license suspension for failure to pay traffic fines and fees. Defendant Shwedo could amend the template Official Notice provided to people facing pending suspensions of their driver's licenses under Section 56-25-20 and the method of affording notice, but fails to do so.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court issue the following relief:

a.    Assume jurisdiction over this action;

b.    Certify a class, referred to above as the Suspension Class, under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, represented by Plaintiffs Bellamy, Carter, and White, related to the First, Second, Fourth and Fifth Claims for Relief;

c.    Certify a class, referred to above as the Reinstatement Fee Class, under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, represented by Plaintiffs Bellamy, Carter, and White related to the Third Claim for Relief;

d.    Issue a declaration that the DMV's enforcement of Section 56-25-20 to indefinitely suspend driver's licenses for nonpayment of traffic fines and fees:

     i.  violates the Equal Protection and Due Process guarantees of the Fourteenth Amendment to the U.S. Constitution, as delineated in *Bearden v. Georgia*, 461 U.S. 660 (1983), by indefinitely depriving people of their driver's licenses for nonpayment without a pre-deprivation hearing on their inability to pay, an inquiry into whether nonpayment was willful, and a determination that the individual willfully failed to pay;

    ii.  violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by depriving people of their driver's licenses without providing any pre-deprivation hearing on their inability to pay and whether nonpayment was willful; and

  iii.  violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by depriving people of their driver's licenses without providing adequate pre-deprivation notice of a process to challenge license suspension for failure to pay traffic tickets based on inability to pay.

e.  Issue a declaration that Section 56-1-390 violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution as delineated in *Bearden v. Georgia*, 461 U.S. 660 (1983), by requiring the DMV to indefinitely suspend the driver's licenses of people who owe reinstatement fees to the DMV without a pre-deprivation hearing on their ability to pay, an inquiry into whether nonpayment was willful, and a determination that an individual willfully failed to pay.

f.  Issue a declaration that the OMVH's enforcement of Section 56-5-2952 to deny hearings to contest a driver's license suspension absent payment of a non-waivable $200 filing fee violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution as delineated in *Bearden v. Georgia*, 461 U.S. 660 (1983).

g.  Enter an injunction to:

i.  prohibit the DMV from suspending driver's licenses for failure to pay traffic tickets under Section 56-25-20 without ensuring adequate pre-deprivation notice of the process to challenge the suspensions, pre-deprivation hearings on inability to pay, and pre-deprivation determinations that nonpayment is willful;

ii.  require the DMV to lift all current suspensions on driver's licenses for failure to pay traffic tickets under Section 56-25-20, to strike all reinstatement fees related to FTPTT suspensions, to reinstate licenses that are subject to no other basis for suspension, and to provide notices to license holders of these changes;

iii.  strike Section 56-1-390, prohibit the DMV from indefinitely suspending driver's licenses for nonpayment of reinstatement fees, and require the DMV to reinstate licenses that are subject to no other basis for suspension and to provide notices to license holders of these changes; and

iv.  prohibit the OMVH from requiring the payment of a filing fee from those who show inability to pay in order to provide a hearing

to prevent or contest the DMV's suspension of a driver's license

for failure to pay a traffic ticket under Section 56-25-20.

h.  Award attorneys' fees and costs as allowed by law; and

i.  Grant such other relief as the Court deems just and appropriate.

DATED this 31st day of October, 2019

Respectfully submitted by,

<u>s/ Susan Dunn</u>

SUSAN K. DUNN (Fed. Bar #647)
American Civil Liberties Union Foundation
  of South Carolina
P.O. Box 20998
Charleston, South Carolina 29413-0998
Tel.: (843) 282-7953
Fax: (843) 720-1428
sdunn@aclusc.org

TOBY J. MARSHALL*
ERIC R. NUSSER*
Terrell Marshall Law Group PLLC
936 N. 34th Street, Suite 300
Seattle, Washington 98103
Tel.: (206) 816-6603
Fax: (206) 319-5450
tmarshall@terrellmarshall.com
eric@terrellmarshall.com

ADAM PROTHEROE (Fed. Bar #11033)
South Carolina Appleseed Legal
  Justice Center
P.O. Box 7187
Columbia, S.C. 29202
Tel.: (803) 779-1113 ext. 106
Fax: (803) 779-5951
adam@scjustice.org

NUSRAT J. CHOUDHURY*
AMREETA S. MATHAI*
ROBERT HUNTER*
American Civil Liberties Union Foundation
New York, New York 10004
Tel.: (212) 549-2500
Fax: (212) 549-2654
nchoudhury@aclu.org
amathai@aclu.org
rwhunter@aclu.org

SAMUEL BROOKE*
EMILY EARLY*
DANIELLE DAVIS*
Southern Poverty Law Center
400 Washington Avenue
Montgomery, Alabama 36104
Tel.: (334) 956-8200
Fax: (334) 956-8481
samuel.brooke@splcenter.org
emily.early@splcenter.org
danielle.davis@splcenter.org

*Applications for pro hac vice admission to be submitted.

# APPENDIX A
## GLOSSARY

| | |
|---|---|
| **AAMVA** | American Association of Motor Vehicle Administrators |
| **ALC** | South Carolina Administrative Law Court |
| **ASCRC** | A Second Chance Resource Center Network United, Inc. |
| **Bench Book** | South Carolina Summary Court Judges Bench Book |
| **Defendant's Notice** | South Carolina Summary Court Form DL-53 (*See* "Notice of Suspension," *infra.*) |
| **DMV** | South Carolina Department of Motor Vehicles |
| **DUS** | Driving Under Suspension. Used to refer to any conviction under S.C. Code Ann. § 56-1-460. |
| **DUS-1** | Driving Under Suspension, First Offense. *See* S.C. Code Ann. § 56-1-460(A)(1)(a) |
| **DUS-2** | Driving Under Suspension, Second Offense. *See* S.C. Code Ann. § 56-1-460(A)(1)(b) |
| **DUS-3** | Driving Under Suspension, Third Offense. *See* S.C. Code Ann. § 56-1-460(A)(1)(c) |
| **FTPTT** | Failure to Pay Traffic Ticket |
| **MUSC** | The Medical University of South Carolina |
| **Notice of Suspension** | South Carolina Summary Court Form DL-53 |
| **NRVC** | Non-Resident Violator Compact |
| **OCA** | South Carolina Office of Court Administration |
| **Official Notice** | DMV letter to driver facing impending driver's license suspension |
| **OMVH** | South Carolina Office of Motor Vehicle Hearings |
| **Traffic Fines and Fees** | Monetary penalties for traffic violations, including fines, fees, surcharges, court costs, and assessments |
| **TIA** | Trial in Absentia |

1